UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
——————————————————————————————

JAMEL L. JENKINS,

                              Plaintiff,

                                                        9:17-CV-0126
v.                                                      (GTS/TWD)


DR. TRACHTMAN,

                              Defendant.
——————————————————————————————

APPEARANCES:                                OF COUNSEL:

JAMEL L. JENKINS
Plaintiff, *pro se*
40 Carol Street
Lakeview, NY 11552

HON. ERIC T. SCHNEIDERMAN                    KATIE E. VALDER, ESQ.
Attorney General for the State of New York   Assistant Attorney General
Attorney for Defendant
The Capitol
Albany, NY 12224


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

### ORDER AND REPORT-RECOMMENDATION

        This prisoner civil rights action commenced pursuant to 42 U.S.C. § 1983 has been

referred to the Court for Report and Recommendation by the Hon. Glenn T. Suddaby, Chief

United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

        On February 6, 2017, Plaintiff Jamel L. Jenkins commenced this action *pro se* by filing a

complaint together with a motion for leave to proceed *in forma pauperis* ("IFP application").

(Dkt. Nos. 1, 2.)  Construed liberally, Plaintiff alleges he was denied adequate medical care in

deliberate indifference to his serious medical need in violation of the Eighth Amendment to the United States Constitution. (Dkt. No. 1.) By Decision and Order filed March 10, 2017, Plaintiff's IFP application was granted, but following a review of the complaint in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), several claims and defendants were dismissed. (Dkt. No. 4.) Plaintiff's Eighth Amendment medical indifference claim against Defendant Dr. Trachtman survived *sua sponte* review. *Id*. at 6-7.[1]

The matter is now before the Court on Dr. Trachtman's motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 13.) Plaintiff has not opposed the motion. For the reasons that follow, the Court recommends that Dr. Trachtman's motion to dismiss be granted and Plaintiff's complaint be dismissed with leave to amend.

## I.    BACKGROUND

The following relevant facts are derived from the face of Plaintiff's complaint and are accepted as true for the purposes of deciding the pending motion. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Plaintiff arrived at Washington Correctional Facility ("Washington C.F.") on June 6, 2016, and since his admission there, he "ha[d] spoken with the Medical Department" about the pain that he has been suffering as a result of a hernia. *Id*. at 5.[2] The physical pain from the hernia became so severe that on October 2, 2016, Plaintiff was taken to the Albany Medical

---

[1]  Page references to documents identified by docket number are to the page assigned by the Court's electronic filing system.

[2]  According to the website maintained by the New York State Department of Corrections and Community Supervision ("DOCCS"), Plaintiff (DIN 12-R-2844) was received into custody on May 27, 2016, and was released on April 3, 2017. *See* http://nysdoccslookup.doccs.ny.gov (last visited Dec. 21, 2017).

Center emergency room. *Id.* at 6. Plaintiff had been told that because of the "magnitude" of

Plaintiff's hernia, it "could rupture" and Plaintiff "would bleed to death." *Id.* at 7. "[H]ospital

officials at Albany Medical Center knew [that Plaintiff] needed treatment immediately" for the

hernia, but Dr. Trachtman "still refused to acknowledge the length of time in which he should

have treated this sufficiently serious medical abnormality." *Id.* "[D]efendants disregarded and

delayed medical treatment Plaintiff was entitled, required, and needed to correct the physical

abnormality present in his abdomen" and he "suffered pain from that abnormality." *Id.* at 9.

Plaintiff had surgery for the hernia on October 14, 2016. (Dkt. No. 1-1 at 2.) "[D]efendants

refus[ed] to provide post surgery pain medication" because of the "Medical Policy" of

Washington C.F. to not provide pain management treatment or pain management medications.

(Dkt. No. 1 at 6.) As a result of delaying the surgery and the lack of pain management and

medication, Plaintiff suffered "irreparable harm" in the form of physical and mental pain and

suffering. *Id.*

## II.    LEGAL STANDARD

A defendant may move to dismiss a complaint on the ground that the complaint fails to

state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In order to state a claim

upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain

statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The

requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint

"must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim

for relief . . . requires the . . . court to draw on its judicial experience and common sense . . .

[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but has not shown – that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007).

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears there are not "enough facts to state a claim that is plausible on its face."  *Twombly*, 550 U.S. at 570. While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation."  *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).  A complaint which "tenders naked assertions devoid of further factual enhancement" does not suffice.  *Id.* (internal quotation marks and citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

In considering a Rule 12(b)(6) motion, "the court considers the complaint, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation and internal quotation marks omitted); *see also Cortec Indus., Inc. v. Sum*

4

*Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (A court may consider "any written instrument attached [to the complaint] as an exhibit or documents incorporated in it by reference.").

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (citations omitted); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally, even after *Twombly*).

Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citing and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that a "better pleading will not cure it." *Id*. (citation omitted).

## III.    DISCUSSION

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, a plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id*. at 184 (citing, *inter alia*, *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to

an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.'" *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith*, 316 F.3d at 185-86. "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Id*. at 185 (quoting *Chance*, 143 F.3d at 702) (emphasis in original). However, "[t]here is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition." *Id*. at 185-86.

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id*. at 835, 837.

## A. Serious Medical Condition

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J.

6

dissenting) (citations omitted), *accord Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).

Relevant factors to consider when determining whether an alleged medical condition is

sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable

doctor or patient would find important and worthy of comment or treatment, (2) the presence of a

medical condition that significantly affects an individual's daily activities; and (3) the existence

of chronic and substantial pain. *Chance*, 143 F.3d at 702-03. While not every hernia rises to the

level of a serious medical need, courts distinguish hernias that require surgery and cause pain.

*See Byng v. Wright*, No. 09-CV-9924(PKC)(JCF), 2012 WL 967430, at *11 (S.D.N.Y. Mar. 20,

2012)[3] (finding chronic pain during nine-month delay of surgery for hernia sufficient to support

assumption that inmate suffered from serious medical condition on motion to dismiss); *McQueen*

*v. Cty. of Albany*, No. 9:08-CV-799 (DNH), 2010 WL 338081, at *11-12 (N.D.N.Y. Jan. 28,

2010) (finding on summary judgment that hernia was not a serious medical need because hernia

did not require surgery and caused inmate only occasional pain and discomfort).

In this case, Plaintiff's hernia required surgery and he alleges pain. Based on these

allegations, the Court finds Plaintiff has sufficiently alleged facts suggesting he had a serious

medical need. *See, e.g.*, *Pine v. Seally*, No. 9:09-CV-1198 (DNH/ATB), 2011 WL 856426, at *7

(N.D.N.Y. Feb. 4, 2011) (finding alleged hernia condition and pain satisfied objective prong of

deliberate indifference claim); *Scaccia v. Cty. of Onondaga*, No., No. 5:07-CV-0207 (GTS/GJD),

2009 WL 4985683, at *6-7 (N.D.N.Y. Dec. 15, 2009) (same).

---

[3]  The Court will provide Plaintiff with copies of all unpublished decisions cited herein in
accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009)
(per curiam).

**B.     Deliberate Indifference**

With regard to the second element, deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Harrison v. Barkley*, 219 F .3d 132, 137 (2d Cir. 2000) (citations omitted).  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104.  A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance*, 143 F.3d at 703.  Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)).  Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer*, 511 U.S. at 835.

Here, the Court finds Plaintiff has failed to plausibly allege that Dr. Trachtman acted with a sufficiently culpable state of mind.  While Plaintiff claims Dr. Trachtman was deliberately indifferent to his serious medical needs when he "refused to acknowledge the length of time in which he should have treated this sufficiently serious medical abnormality in Plaintiff's system and body[,]" there is no allegation that Dr. Trachtman was aware, at any point prior to October 6, 2016, of Plaintiff's hernia or pain.  (Dkt. Nos. 1 at 6, 1-1 at 2.[4])  Further, Plaintiff's complaint is void of any allegation that Dr. Trachtman was involved in the treatment of Plaintiff's hernia, nor

---

[4]  The Court notes that while Plaintiff states he was scheduled for surgery since March 2016 (Dkt. No. 1-1 at 2), he was received into DOCCS custody on May 27, 2016.  *See* http://nysdoccslookup.doccs.ny.gov (last visited Dec. 21, 2017).  Plaintiff reported his hernia to Downstate Reception and, upon being transferred to Washington C.F., Plaintiff reported his hernia to the "medical department."  (Dkt. No. 1 at 5-6.)

does Plaintiff allege that he requested and was refused medical treatment or pain medication from Dr. Trachtman.

According to Plaintiff, the physical pain from the hernia became so severe that on October 2, 2016, he was taken to the Albany Medical Center emergency room. (Dkt. No. 1 at 6.) Plaintiff told Dr. Trachtman he was in pain on October 6, 2016, and Plaintiff had hernia surgery on October 14, 2016. (Dkt. No. 1-1 at 2.) As pleaded, Plaintiff's surgery was not performed as soon as he would have liked. That does not give to a constitutional claim. See *Johnson v. Wright*, 477 F. Supp. 2d 572, 576 (W.D.N.Y. 2007) ("That plaintiff may have preferred a more aggressive course of treatment, or more prompt surgery, does not show that defendants acted wantonly with the purpose of causing him pain."). "Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (internal citations omitted). In this case, Plaintiff has not plausibly alleged that this delay amounted to deliberate indifference. Moreover, delay alone will not give rise to a constitutional claim unless the delay causes substantial harm. *Shuler v. Edwards*, 485 F. Supp. 2d 294, 299 (W.D.N.Y. 2007).

At most, Plaintiff alleges Dr. Trachtman acted negligently and did not take such steps to treat Plaintiff's hernia as soon as he should have. However, negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer*, 511 U.S. at 835. Thus, any claims of medical malpractice or disagreement with treatment are not actionable under § 1983. *Ross v. Kelly*, 784 F. Supp. 35, 44-45 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (1992)

(table).  Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim.  *See Sonds*, 151 F. Supp. 2d at 311.

Based on the foregoing, the Court finds Plaintiff's complaint lacks any factual allegations plausibly demonstrating that Dr. Trachtman was deliberately indifferent to his serious medical needs.  Therefore, the Court recommends granting Dr. Trachtman's motion to dismiss.

### C.     Personal Involvement

"In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some 'tangible connection' between the unlawful conduct and the defendant."  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  Thus, the mere linkage to the alleged unlawful conduct through the prison chain of command is insufficient to show personal involvement, and the doctrine of *respondent superior* is unavailable to hold supervisory officials liable.  *Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (per curium).

Plaintiff also alleges there is a "medical policy, which does not provide for pain management treatment nor provide pain management medications."  (Dkt. No. 1 at 6.)  However, as set forth above, the complaint lacks any allegation that Plaintiff requested and was refused pain medication by Dr. Trachtman.  Plaintiff has not alleged what supervisory role, if any, Dr. Trachtman had over the medical staff, medical personnel, or the medical department at Washington C.F., nor has Plaintiff alleged what role, if any, Dr. Trachtman had in the creation and maintenance of this "medical policy."  Therefore, the Court finds Plaintiff has failed to plead personal involvement on the part of Dr. Trachtman relating to the alleged "medical policy, which does not provide for pain management treatment nor provide pain management medications."

### D.     Leave to Amend

Ordinarily, a *pro se* plaintiff whose claims are found to be insufficient to withstand scrutiny under Rule 12(b)(6) should be granted leave to amend at least once to afford him the opportunity to cure any perceived deficiencies and assert a proper claim.  *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) (leave to replead shall "be freely given when justice so requires").  In deference to Plaintiff's *pro se* status, the Court recommends that Plaintiff be permitted the opportunity to replead his Eighth Amendment medical indifference claim against Dr. Trachtman to cure the pleading defects discussed above.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendant Dr. Trachtman's Rule 12(b)(6) motion to dismiss (Dkt. No. 13) be **GRANTED**; and it is further

**RECOMMENEDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED WITH LEAVE TO AMEND**; and it is further

**ORDERED** that the Clerk provide plaintiff with a copy of this Order and Report-Recommendation, along with a copy of the unpublished decisions cited herein, in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 20 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[5]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

---

[5] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

**PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (*citing*

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.


Dated: December 21, 2017
     Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

2012 WL 967430
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Kevin V. BYNG, Plaintiff,
v.
Dr. Lester WRIGHT, Chief
Medical Officer, et al., Defendants.

No. 09 Civ. 9924(PKC)(JCF).
|
March 20, 2012.

*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge.

**\*1** Plaintiff Kevin V. Byng, proceeding *pro se,* brings this action pursuant to 28 U.S.C. § 1983 against various employees of the New York State Department of Correctional Services ("DOCS") in their individual and official capacities. Byng alleges that while he was incarcerated at Fishkill Correctional Facility ("Fishkill"), the defendants violated his constitutional rights by failing to attend to his medical needs. The defendants move for summary judgment under Rule 56, FED. R. CIV. P. For the reasons set forth below, the motion is granted.

*BACKGROUND*

The following facts are either undisputed or described in the light most favorable to the plaintiff. *See, e.g., Costello v. City of Burlington,* 632 F.3d 41, 45 (2d Cir.2011). Plaintiff Kevin Byng was an inmate at Fishkill from June 2007 to February 2009. (Defs.' 56.1 ¶ 5; Pl.'s 56.1 Resp. ¶ 5.) Fishkill is a medium-security prison in the DOCS system. The four named defendants were DOCS prison officials at all times relevant to this action. Lester N. Wright, M.D., M.P.H. ("Dr.Wright") was the Deputy Commissioner and Chief Medical Officer of DOCS. (Wright Decl. ¶ 1.) Harry Mamis, M.D. ("Dr.Mamis") was a physician at Fishkill. (Mamis Decl. ¶ 1.) Mary D'Silva, D.D.S. ("Dr.D'Silva") was the State Dental Director of DOCS. (D'Silva Decl. ¶ 1.) Mahammed Samad, D.D.S. ("Dr.Samad") was a dentist at Fishkill.

(Samad Decl. ¶ 1.) Byng's allegations arise from the defendants' failure to provide him adequate medical and dental care during his confinement at Fishkill. [1] The Court reviews Byng's pertinent medical and dental conditions as they relate to each defendant below.

[1]   Byng also named as defendant Dr. Denise Williams. (Am.Compl.¶ 11.) Byng withdrew his claim against Dr. Williams in his opposition to this motion, stating that he "can not [sic] prove deliberate indifference against" her. (Pl.'s Mem. L. Opp. at 16.) Accordingly, the Court dismisses Byng's Amended Complaint as against Dr. Williams.

I. *Medical Conditions*

a. *Hepatitis* C

Byng suffers from several medical conditions, including Hepatitis C, neutropenia, chronic fatigue syndrome, and chronic pain in the right upper quadrant of his abdomen. (Byng Aff. ¶¶ 3, 4.) Byng's allegations against Dr. Wright arise from two instances in which Dr. Wright denied Byng's requests for Hepatitis C treatment.

Hepatitis C ("HCV") is a viral infection of the liver. (Korsten Decl. ¶ 3.) Byng was first diagnosed with HCV in November 2004. (Byng Dep. at 3839.) From April 2005 through March 2006, Byng underwent Rebetron therapy for HCV while incarcerated at another DOCS facility. (*Id.* at 4142.) Rebetron therapy is a combination of Ribavirin pills and injections of Interferon. (Wright Decl. ¶ 3.) Byng's therapy was complicated by neutropenia, a chronic deficiency in a person's white blood cell count. Byng's physician ceased the treatment for one week on three separate occasions during the forty-eight week cycle due to Byng's low white blood cell counts. (Kim Decl. Ex. D at 30, 158, 171–73.) Byng completed his Rebetron cycle in April 2006. (Pl.'s 56.1 Resp. ¶ 5.)

After being incarcerated at Fishkill, Byng sought retreatment for his HCV. On September 27, 2007, Byng requested retreatment from his physician, Dr. Mamis. (Mamis Decl. ¶ 3.) Dr. Mamis recorded the request in Byng's medical records and noted that Byng's prior Rebtron cycle was complicated by a low white blood cell count. (Kim Decl. Ex. D at 38.) Dr. Mamis then referred Byng to an infectious disease specialist, Dr. Charles Rush, who recommended that Byng receive Rebatron therapy. (Korsten Decl. ¶ 6; Byng Dep. at 49.)

**\*2** As Byng had requested, Dr. Mamis sought approval from Dr. Wright to treat Byng's HCV on October 26, 2007. (Mamis Decl. ¶ 6.) Dr. Wright's approval was required for an inmate to receive HCV treatment. (Wright Decl. ¶ 6.) The request Dr. Mamis submitted to Dr. Wright included Byng's August 2007 blood test results and a summary of his prior Rebetron cycle. (Kim Decl. Ex. D at 68–71.) Dr. Mamis also wrote to Dr. Wright that Byng's prior Rebetron cycle contained "multiple stops and starts due to low [white blood cell counts]" and that Byng "chronically refused" his neutropenia medication. (*Id.* Ex. E at 375–76.)

Dr. Wright denied the request. In an electronic reply to Dr. Mamis on October 29, 2007, Dr. Wright stated that Byng's prior treatment was a "failure," that his current ALT was normal, and that his Absolute Neutrophil Count ("ANC") was "below the minimum" level of 1,000. (*Id.* at 376.) DOCS' Hepatitis C Primary Care Practice Guideline ("HCV Guidelines") identified elevated ALT and an ANC higher than 1,000 as criteria for HCV treatment. (*Id.* Ex. F.) Byng's August 2007 blood test results confirm the data upon which Dr. Wright based his decision. (*Id.* Ex. E at 376; Korsten Decl. ¶ 7.)

Byng again sought retreatment in September 2008. (Kim Decl. Ex. D at 81.) During an examination, Dr. Rush observed that Byng's viral load "[w]as climbing rapidly" and recommended retreatment, stating that he "believe[d] an attempt [at] retreatment ... is easily justifiable, i.e. there is a reasonable chance of success." (*Id.* at 81, 88.) Byng also contacted two outside physicians who both recommended treatment. (Pl.'s Mem. L. Opp. Ex. B24B26.) One of the physicians, Dr, Gabriel Ionescu, M.D., a liver specialist, opined that "[i]f there is a good time to treat, it is now." (*Id.* at B26.) Based on Dr. Rush's consultant report, Byng's physician submitted another electronic treatment request to Dr. Wright on October 9, 2008. (Wright Decl. ¶ 9.) Dr. Edward Sottile, a supervising DOCS physician, also approved the request.

Dr. Wright again denied the request. Acknowledging that Byng's "prior treatment apparently was successful" and that he had a "large viral load," Dr. Wright cited Byng's "normal" ALT level as grounds for denial. (Pl.'s Mem. L. Opp. Ex. B27.) Dr. Wright instead recommended "monitor[ing]" Byng's ALT levels every six months. (*Id.*) On November 3, 2008, Byng was told of the denial and

that Dr. Wright "would like his ALT monitored every six months ... if it changes to above normal." (Kim Decl. Ex. D at 24.) At this time, the FDA had not approved any course of retreatment for HCV patients who had relapsed after undergoing prior Rebetron therapy. (*Id.* Ex. F.)

Following Byng's release from Fishkill, he began a cycle of Rebetron therapy at a private facility in May 2010. (Pl.'s 56.1 Resp. ¶ 10; Korsten Decl. ¶ 9.) However, Byng terminated the treatment after one month due to nausea, chills, headaches, and vomiting. (Byng Dep. at 57.) Thereafter, Byng neither sought nor underwent further HCV treatment. (*Id.*)

### b. *Right Inguinal Hernia*

**\*3** Byng suffers from chronic pain in the upper right quadrant of his abdomen ("RUQ"). (Byng Aff. ¶ 5.) Byng's allegations against Dr. Mamis arise in part from inadequate treatment Byng received for his RUQ.

Dr. Mamis first saw Byng on September 27, 2007 at which Byng alleges complaining of RUQ pain. (Pl.'s 56.1 Resp. ¶ 16.) Dr. Mamis recorded in Byng's medical records that Byng made a "routine visit" seeking retreatment for HCV, but did not record Byng's alleged RUQ complaint. (Kim Decl. Ex. D at 38.) Dr. Mamis next saw Byng on November 2 where Byng complained of RUQ pain, a bloated stomach, and a sore right thumb. (Byng Dep. at 48; Mamis Decl. ¶ 9.) Dr. Mamis scheduled an x-ray on Byng's right thumb, but did not order x-rays or further treatment on Byng's hernia-related pain. (Mamis Decl. ¶ 9; Kim Decl. Ex. D at 36.) Byng's medical records show that he complained of RUQ pain to other physicians on at least four prior occasions, including October 29, 2007. (Kim Decl. Ex. D at 37, 38–40.)

Dr. Mamis next saw Byng on January 3, 2008, this time finding a "questionable right inguinal hernia" and ordering a surgery consultation. (*Id.* at 34.) Byng then saw a surgeon who recommended surgery. (Pl.'s Mem. L. Opp. Ex. A3.) Dr. Mamis last saw Byng on February 15 when he prescribed Byng Ibuprofen to alleviate his hernia pain. (Kim Decl. Ex. D at 33.) Byng underwent hernia surgery on March 7, 2008. (*Id.* at 68.)

During this period, Byng submitted at least four requests that Dr. Mamis be replaced as his primary physician. (Pl.'s Mem. L. Opp. Ex. A10–A11.) Dr. Edward Sottile, a Medical Director at Fishkill, ultimately interviewed Byng

2012 WL 967430

about his complaints and replaced Dr. Mamis on March 31, 2008 "to prevent any further problems." (Kim Decl. Ex. D at 323.) Byng testified that he still experiences "chronic, at time severe" pain in his RUQ. (Byng Aff. ¶ 5.)

### c. *Neutropenia*

Byng also alleges that Dr. Mamis failed to adequately attend to Byng's neutropenia, a chronic deficiency in a person's white blood cell count. (Mamis Decl. ¶ 4.) While previously incarcerated at another DOCS facility, Byng was prescribed Neupogen to medicate his neutropenia but refused to take it on multiple occasions because it caused him nausea, fatigue, migraine headaches, insomnia, and itching. (Byng Dep. at 38–39, 41–42.) Byng's medical records show that during his November 2, 2007 appointment with Dr. Mamis, Byng asked to see Dr. Rush regarding his neutropenia. (Kim Decl. Ex. D at 35.) Dr. Mamis denied the request, writing in Byng's medical record that there was "no reason" to see Dr. Rush. (*Id.*) Dr. Mamis testified that he based his denial on Byng's August 2007 blood test results, which showed a stable neutrophil count of 984. (Mamis Decl. ¶ 13; Kim Decl. Ex. D at 68–71.)

### II. *Dental Conditions*

Byng's remaining allegations regard inadequate dental care. Byng alleges that Dr. D'Silva failed to promptly schedule extraction of two of Byng's teeth, and that Dr. Samad physically harmed Byng during a dental appointment. At all relevant times, Fishkill maintained a dental clinic from 8:00 AM to 12:00 PM every weekday. (D'Silva Decl. ¶ 10.) Toenter the dental clinic, an inmate needed a Sick Call pass from his housing officer. (*Id.*) Fishkill also maintained a medical clinic wherein an inmate could receive dental care when the dental clinic was closed. (*Id.* ¶ 11.) As with the dental clinic, an inmate seeking dental care needed to obtain a Sick Call pass from his housing officer. (*Id.*) Byng alleges that housing officers "regularly" denied requests for a Sick Call pass and that the usual "process" was to complete an Inmate Request for Dental Services ("IRDS") form and submit it to the dental clinic. (Byng Aff. ¶ 8.)

**\*4** Byng first received dental treatment on January 7, 2008, visiting the dental clinic during Sick Call. (Kim Decl. Ex. G at 389.) Byng complained of a cavity in tooth # 15 and a crack in tooth # 2. (*Id.*) Dr. Ahmed, the attending dentist, noted in Byng's dental record that tooth # 15 was

"non-re storable" and recommended extraction of both teeth. (Pl.'s Mem. L. Opp. Ex. C1.) The dental record does not indicate that Byng complained of any pain, and no further treatment was scheduled. (*Id.*)

In the months that followed, Byng wrote to DOCS a series of complaints regarding his two cracked teeth. Byng's dental records show DOCS received at least four complaints: an Inmate Request for Dental Services ("IRDS") dated March 16, an Inmate Request Form ("IRF") dated July 7, an IRDS dated November 25, and an IRF dated December 24, 2008. In his July 7 IRF, Byng stated that he had "been waiting for months" for extraction of his two cracked teeth. (Kim Decl. Ex. D at 272–73; *id.* Ex. G at 393–94.) In his November 25 IRDS, Byng reiterated that he had "been filling out these requests for over (6) months." (*Id.* Ex. G at 382.) These four complaints were all stamped "Received" by Fishkill's Dental Department. Byng also wrote a letter to Fishkill's Grievance Office on December 1, 2008 alleging his complaints were being "intentionally ignored." (*Id.* Ex. D at 308–09.) Byng also alleges that he wrote at least seven complaints in addition to the four received by DOCS and filed in his dental record, including a letter to D'Silva dated August 14, 2008. (*See, e.g.,* Pl.'s Mem. L. Opp. Ex. C3–C6, C8, C10, C22.)

In response to Byng's complaints, Fishkill's dental clinic scheduled an appointment and sent to Byng at least five written memoranda. Byng received a memo on April 9, 2008 stating "Appointment Scheduled," and another on June 10, 2008 confirming that Byng was "already on [the] list because of [Byng's] previous request." (*Id.* Ex. C7, C9.) Another memo dated August 19 advised Byng to notify his unit officer on his "next sick call day" to receive treatment. (*Id.* Ex. C11.) Byng was further told on December 8 that he was "scheduled for a dental appointment in the near future" and received another memo on December 23 reiterating that he was "already" scheduled for an appointment. (*Id.* Ex. C18; Kim Decl. Ex. D at 311.) Karen Bellamy, an official of DOCS' Central Office Review Committee, wrote to Byng in January 2009 that any delay "was due to staff shortages." (Pl.'s Mem. L. Opp. Ex. C16.)

Byng was next seen on January 2, 2009, again visiting the dental clinic during Sick Call. (*Id.* Ex. C1.) Byng alleges Dr. Samad, the attending dentist, "intentionally banged" on one of his teeth using a metal instrument. (Samad

Decl. ¶ 5.) Byng further alleges that Dr. Samad "yanked" his neck backward and told Byng to "shut up." (*Id.* ¶ 6.) Byng detailed his allegations against Dr. Samad in a grievance letter. (Pl.'s Mem. L. Opp. Ex. C14–C15.) Byng's dental record shows that the appointment resulted in Dr. Samad taking x-rays of Byng's two affected teeth and Byng "le[aving] without asking [Dr. Samad] anything." (*Id.* Ex. C1.)

**\*5** The dental appointment DOCS had scheduled for Byng occurred on January 7, 2009. (Defs.' 56.1 ¶ 22; Pl.'s 56.1 Resp. ¶ 22.) Dr. Williams administered anesthesia and extracted the root of plaintiff's tooth # 2. (D'Silva ¶ 7.) Dr. Williams also prescribed Motrin for Byng's pain and scheduled a follow-up appointment. (*Id* .) Byng attended his follow-up appointment, but refused treatment because he did "not feel well, [was] sick to [his] stomach and ha[d] a migraine headache." (Kim Decl. Ex. D at 263,) Byng did not seek further treatment and later removed "what was left" of tooth # 15 himself using a pair of pliers. (Pl.'s 56.1 Resp. ¶ 20.)

### GOVERNING LAW

#### I. *Summary Judgment Standard*

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), FED. R. CIV. P. It is the initial burden of a movant to come forward with evidence on each material element of his claim or defense sufficient to demonstrate that he is entitled to relief as a matter of law. *See Vt. Teddy Bear Co. v. 1800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004). In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.' " *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. U .S. Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)).

A fact is material if it "might affect the outcome of the suit under the governing law," meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the evidence in the light most favorable to

the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the non-moving party. *Costello,* 632 F.3d at 45; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In reviewing a motion for summary judgment, the court may scrutinize the record, and grant or deny summary judgment as the record warrants. Rule 56(c)(3). In the absence of any disputed material fact, summary judgment is appropriate. Rule 56(a).

"A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation." *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir.2008) (internal citation omitted); *see also Anderson,* 477 U.S. at 249–50 (holding that summary judgment may be granted if the opposing evidence is "merely colorable" or "not significantly probative") (citations omitted). At the summary judgment stage, the opposing party "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of N.Y.,* 426 F.3d 549, 554 (2d Cir.2005). The opposing party's facts "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." *Contemporary Mission, Inc. v. U.S. Postal Serv.,* 648 F.2d 97, 107 n. 14 (2d Cir.1981) (internal quotations omitted).

**\*6** Local Civil Rule 56.1 of this District requires a summary judgment movant to submit a statement with numbered paragraphs setting forth "the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civil Rule 56.1(a). "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civil Rule 56.1(c). "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed.R.Civ.P. 56(c)." Local Civil Rule 56.1(d). "A party may object that the

Byng v. Wright, Not Reported in F.Supp.2d (2012)
Case 9:17-cv-00126-GTS-TWD    Document 15    Filed 12/22/17    Page 17 of 54
2012 WL 967430

material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Rule 56(c). "Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 264 (2d Cir.2009) (internal quotations omitted).

A *pro se* party's submissions are to be read liberally, a requirement that is especially strong in the summary judgment context where claims are subject to a final dismissal. *See Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) ( "[S]pecial solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment."). However, proceeding *pro se* does not relieve a litigant from the usual requirements of summary judgment. A *pro se* plaintiff's "bald assertion, completely unsupported by evidence," does not satisfy his burden as the non-movant *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

II. *Deliberate Indifference to Serious Medical Needs*
The Eighth Amendment prohibits infliction of "cruel and unusual punishments," including punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). A prison official's "deliberate indifference to [the] serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To state a "cognizable" Eighth Amendment claim in this context, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106.

The deliberate indifference standard has two prongs. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The first prong is objective: the alleged deprivation of medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The second prong is subjective: the charged official must have acted with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). A prisoner must satisfy both prongs to prevail on his claim. *See id.*

**\*7** Under the objective prong, a prisoner must prove that the alleged deprivation of medical treatment was sufficiently serious, amounting to "a condition of urgency ... that may produce death, degeneration, or extreme pain." *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (internal quotations omitted). "There is no settled, precise metric" as to how serious the condition must be. *Brock v. Wright,* 315 F.3d 158. 162 (2d Cir.2003). A court thus considers the facts and circumstances of the particular case, including whether "a reasonable doctor or patient would find [the ailment] important and worthy of treatment;" whether the ailment's presence significantly affects the prisoner's daily activities; and whether the pain is "chronic and substantial." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotations omitted). "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to ... whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter,* 316 F.3d 178, 187 (2d Cir.2003).

The subjective prong requires the prisoner to establish that the defendant acted with a "sufficiently culpable state of mind." *Wilson,* 501 U.S. at 298. The standard is deliberate indifference to the prisoner's health. *Salahuddin,* 467 F.3d at 280. "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Farmer,* 511 U.S. at 837). Courts equate this standard to that of recklessness under criminal law. *See Farmer,* 511 U.S. at 839–40. As such, a prisoner must show "more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66; *see also Salahuddin,* 467 F.3d at 279 ("[N]ot every lapse in medical care is a constitutional wrong."). "Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Chance,* 143 F.3d at 703.

*ANALYSIS*

I. *Claims Against the Defendants in Their Official Capacities*

2012 WL 967430

Byng sues the four named defendants in both their official and individual capacities. Absent a waiver or valid congressional override, the Eleventh Amendment bars an action for damages by a private plaintiff against the state. *Seminole Tribe v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). This immunity extends to state officials acting in their official capacity. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Agencies and departments of the state are also immune. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Section 1983 does not abrogate Eleventh Amendment immunity. *See Quem v. Jordan,* 440 U.S. 332, 338, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Damages are thus not recoverable in a section 1983 action against state officials acting in their official capacities. *Davis v. New York,* 316 F.3d 93, 10102 (2d Cir.2002).

**\*8** Byng alleges deliberate indifference to his medical and dental needs by the four named defendants in "both" their individual and official capacities. (Am. Compl. at 1.) As a state agency, DOCS is entitled to assert Eleventh Amendment immunity. *Davis,* 316 F.3d at 101. As all of Byng's allegations arise from acts committed by the defendants acting as officials employed by DOCS, Byng's section 1983 claims against the defendants in their official capacities are dismissed. *See, e.g., id.* (granting immunity from prisoner's section 1983 claims to DOCS officials).

However, Byng's allegations against the defendants in their individual capacities are not barred by the Eleventh Amendment. *See Hafer v. Melo,* 502 U.S. 21, 2731, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). The Court addresses the merits of those claims below.

## II. *Claims Against the Defendants in Their Individual Capacities.*

### a. *Dr. Wright*

Byng alleges that Dr Wright was deliberately indifferent to his medical needs by denying Rebetron therapy on October 26, 2007 and November 3, 2008 over the recommendations of Byng's treating physicians. (Am.Compl.¶¶ 22, 35.) "[A] deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians." *Johnson,* 412 F.3d at 404 (internal citations omitted). A prison official's conscious decision to prescribe an "easier and less efficacious treatment plan"

may also establish deliberate indifference. *Brock,* 315 F.3d at 167 (internal quotations omitted). However, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703. "[C]laims based on differences of opinion over matters of medical judgment[ ] fail to rise to the level of a [section] 1983 violation." *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972). This Court assumes that HCV qualifies as a serious medical condition. *See Pabon v. Wright,* 2004 WL 628784, at \*5 (S.D.N.Y. Mar.29, 2004) (collecting cases); *see also Salahuddin,* 467 F.3d at 281 (presuming that five-month delay in receiving HCV treatment was sufficiently serious).

In *Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005), the Second Circuit reversed a grant of summary judgment to Dr. Wright where the plaintiff, a DOCS prisoner with HCV, alleged Dr. Wright's deliberate indifference in denying him treatment over the recommendations of his treating physicians. *See id.* at 404–05. Despite the physicians' unanimous view that ribavirin therapy was appropriate, Dr. Wright denied the request because the plaintiff had tested positive for marijuana on a single occasion—mandatorily disqualifying him under DOCS' HCV Guidelines. *See id.* The Second Circuit held that a reasonable jury could conclude that Dr. Wright had acted with a sufficiently culpable state of mind "by reflexively following the Guideline's substance abuse policy" in denying treatment. *Id.* at 406.

**\*9** *Johnson* does not dictate the outcome of this case. Unlike in *Johnson,* the record shows that Dr. Wright was in possession of and considered Byng's medical records, August 2007 blood test results, and prior Rebetron cycle in denying treatment. In the October 29, 2007 denial, Dr. Wright relayed to Dr. Mamis: "Prior treatment failure. Current ALT normal. Current ANC below the minimum 1000. Treatment not indicated." (Kim Decl. Ex. E at 376.) Dr. Wright's decision was thus based on at least three factors pertaining to Byng's individualized medical profile: his ALT level, reflecting his liver function, his ANC level, reflecting his white blood cell count, and his relapse following an already-completed Rebetron cycle. (Wright Decl. ¶¶ 7, 8.)

Similarly, there is insufficient evidence that Dr. Wright acted with a culpable state of mind in denying Byng's second request for treatment. In his reply dated November 3, 2008, Dr. Wright stated in full:

His prior treatment apparently was successful and although he has a large viral load now he has normal ALT. Why not monitor ALT every 6 months and if it takes significant elevation consider retreatment then; hopefully with more effective therapy then.

(Pl.'s Mem. L. Opp. Ex. B27.) Byng's physician discussed with him Dr. Wright's opinion, informing Byng that Dr. Wright "would like his ALT monitored every six months" and that treatment would be "reconsider[ed]" if his ALT rose above normal. (Kim Decl. Ex. D at 24.) As with the previous request, Dr. Wright was in possession of Byng's medical records, blood test results, and a summary of Byng's prior Rebetron cycle when he rendered his decision. (Pl.'s Mem. L. Opp. Ex. B27.) Dr. Wright testified under oath that he also considered Byng's heightened risk of infection and difficulties with neupogen, his neutropenia medication. (Wright Decl. ¶ 10.) Byng offers no admissible evidence disputing that Dr. Wright's decision was the result of his own medical judgment, or that DOCS officials did not "regularly monitor[ ]" his ALT levels using liver function tests during Byng's final months at Fishkill. (*Id.* ¶ 8.) "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703.

Testimony from other physicians familiar with Byng's medical profile supports Dr. Wright's denial as the product of a well-considered medical judgment. Mark Korsten, M.D., the defendants' expert witness, testified that Byng "failed to achieve a sustained viral response" from his 2005 Rebetron cycle and that there exists "no published data" proving Rebetron therapy's effectiveness in treating patients who relapse. (Korsten Decl. ¶ 11.) And Dr. Mamis, Byng's physician until March 2008, advised Fishkill's superintendent that Rebetron therapy was "very risky" given Byng's "prior history of neutropenia." (Kim Decl. Ex. D at 324.) "[T]he law is clear that a difference of opinion ... even among medical professionals themselves, as to the appropriate course of medical treatment does not in and of itself amount to deliberate indifference." *Williams v. M.C.C. Institution,* 1999 WL 179604, at *7 (S.D.N.Y. Mar.31, 1999) (Preska, J.). Byng's "mere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703.

**\*10** In this case, Dr. Wright neither "reflexively" nor "mechanically" relied on the HCV Guidelines, nor was he willfully blind to potential risks to Byng's health. *Cf. Johnson,* 412 F.3d at 404–06; *Verley v. Wright,* 2007 WL 2822199, at *11 (S.D.N.Y. Sept.27, 2007).* No reasonable jury could conclude that Dr. Wright was deliberately indifferent to Byng's serious medical needs. Dr. Wright made a considered medical judgment and is entitled to summary judgment as to Byng's claims against him.

### b. *Dr. Mamis*

Byng alleges that Dr. Mamis was deliberately indifferent to his serious medical needs by, intentionally delaying Byng from seeing Dr. Rush for HCV treatment; "sabotaging" his September 2007 recommendation to Dr. Wright for HCV treatment; delaying Byng's hernia operation by not examining his abdominal pain; refusing to treat his neutropenia; and refusing to changed his "soiled, leaking dressing" after Byng's hernia operation. (Am.Compl.¶ 68.) The Court addresses each of these five allegations in turn.

Byng's first allegation that Dr. Mamis intentionally delayed him from seeing Dr. Rush for his HCV fails under both prongs of the deliberate indifference standard. Byng's medical records show that Dr. Mamis first saw Byng on September 27, 2007 for a "routine visit ." (Kim Decl. Ex. D at 38.) Byng's records also show that Dr. Mamis recorded Byng's request for HCV treatment, and that Dr. Mamis referred Byng to Dr, Rush that same day for a consultation that occurred on October 23, 2007. (Pl.'s Mem. L. Opp. Ex. B12.) "When the basis for a prisoner's Eighth Amendment claim is a temporary delay" in treatment, it is "the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition*" on which the Court must focus. *Carpenter,* 316 F.3d at 185 (emphasis in original). Byng comes forward with no evidence that he sustained a serious adverse health effect between his September 27 visit with Dr. Mamis and his October 23 consultation with Dr. Rush, or that Dr. Mamis was deliberately indifferent in processing his referral the very day he first saw Byng.

Byng next alleges that Dr. Mamis "sabotaged" his HCV treatment recommendation by including "incorrect medical information." (Am.Compl.¶ 22.) The electronic form Dr. Mamis submitted to Dr. Wright contained Byng's August 2007 blood test results and medical history.

(Kim Decl. Ex. E at 375–76.) Also included was Dr. Mamis's statement that Byng's prior Rebetron therapy contained "multiple stops and starts" due to low white blood cell counts and that Byng "chronically refus[e]d neupogen." (*Id.*)

Byng has failed to come forward with evidence that Dr. Mamis acted with a sufficiently culpable state of mind in recommending HCV treatment. Byng offers no evidence that the blood test results referred to in the electronic form were inaccurate; to the contrary, the results match Byng's August 2007 laboratory results. (*Id.* Ex. D at 68–71; Korsten Decl. ¶ 7.) Byng's daily medical records from his 2005 Rebetron cycle confirm that his white blood cell count fluctuated and that he refused neupogen on multiple occasions. (*See, e.g.,* Kim Decl. Ex. D at 14952, 15558, 167.) Indeed, Byng's medical records contain two "Refusal of Medical Examination And/Or Treatment" forms, both signed by Byng, wherein he objected to taking his neupogen. (*Id.* at 229, 238.) Dr. Sottile, a supervising physician, confirmed to Byng in a memorandum dated November 4, 2008 that Byng's physicians had "given the data to Dr. Wright" and that Dr. Wright had "[a]ll of the correct medical information." (*Id.* at 299, 303.)

**\*11** Even had Dr. Mamis mistakenly represented Byng's medical data to Dr. Wright, this error alone would not carry Byng's burden of coming forward with evidence of a culpable state of mind. Mere negligence is insufficient to satisfy the subjective prong of the deliberate indifference standard. *Hathaway,* 37 F.3d at 66; *see, e.g., Farid v. Ellen,* 2006 WL 59517, at \*11 (S.D.N.Y. Jan.11, 2006) (granting summary judgment where plaintiff "speculat[ed] that [his physician] had somehow doctored plaintiff's medical records to fabricate details of his medical history" on single occasion). Byng has failed to show deliberate indifference to serious medical needs on the part of Dr. Mamis as it relates to this allegation.

Third, Byng alleges that Dr. Mamis ignored his RUQ pain for nine months beginning in July 2007, delaying examination of and operation on his hernia. (Am.Compl.¶¶ 18, 68.) When the basis of a deliberate indifference claim is a delay in treatment, the focus is the "particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition." *Carpenter,* 316 F.3d at 186. Byng alleges that from the day he was incarcerated at Fishkill on June 12, 2007, he suffered

"chronic, at times severe pain" that made it difficult to walk. (Am.Compl.¶¶ 18, 26, 68.) Byng's hernia operation occurred on March 7, 2008. (Pl.'s Mem. L. Opp. Ex. A5.) The Court assumes that Byng's chronic RUQ pain during this period was a sufficiently serious medical condition.

Accepting this allegation as true and drawing all reasonable inferences in his favor, Byng has failed to show that Dr. Mamis acted with a sufficiently culpable state of mind. Byng alleges that he complained of hernia-related pain on four occasions in June and August 2007, but to physicians other than Dr. Mamis. (Pl.'s 56.1 Resp. ¶ 16.) There is no evidence in Byng's medical records that Dr. Mamis examined Byng prior to September 27, 2007 or that Byng complained of RUQ pain during this appointment. (Kim Decl. Ex. D at 38.) The entirety of Byng's case are the allegations in his Amended Complaint that Dr. Mamis simply ignored Byng's complaint. "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of N.Y.,* 88 F.3d 63, 71 (2d Cir.1996) (citing *Matsushita,* 475 U.S. at 587 (1986)); *see, e.g., Cain v. Jackson,* 2007 WL 2193997, at \*7 (S.D.N.Y. July 27, 2007) (Preska, J.) (granting summary judgment on section 1983 deliberate indifference claim where prisoner offered "no evidence or testimony, other than her own allegations"). Byng has not come forward with evidence that Dr. Mamis was "aware of facts from which [an] inference could be drawn that a substantial risk of serious harm exist[ed]" and that he "actually" drew that inference. *Hathaway,* 37 F.3d at 66.

Dr. Mamis's alleged failure to diagnose Byng's hernia during their next appointment on November 2, 2007, accepted as true, does not satisfy the subjective prong of the deliberate indifference standard. "[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim ." *Chance,* 143 F.3d at 703. Byng's medical records reflect that Dr. Mamis examined Byng's RUQ, and found no "definitive signs of a hernia." (Kim Decl. Ex. D at 36.) Moreover, Dr. Mamis ordered x-rays for Byng's ailing right thumb and diagnosed Byng's hernia the very next time he saw Byng on January 3, 2008. (*Id.* at 33–34.) Dr. Mamis's error in failing to diagnose Byng's hernia on September 27 or November 2 "suggests at most several acts of negligence over a prolonged period. That is not enough to support an Eighth Amendment violation." *Hernandez v. Keane,* 341 F.3d 137, 145–46 (2d Cir.2003) (affirming summary

judgment where prisoner alleged his physician failed to schedule follow-up appointment and hand surgery for prisoner over three-month period).

*12 Byng's fourth allegation that Dr. Mamis refused to allow him to see Dr. Rush about his neutropenia condition fails under both prongs of the deliberate indifference standard. (Am.Compl.¶¶ 24, 68.) First, nowhere in the Amended Complaint nor in his opposition does Byng allege suffering any adverse health effects, serious or otherwise, from any delay in seeing Dr. Rush regarding his neutropenia. "[T]he essential test is one of medical necessity and not one simply of desirability." *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). Here, Byng has failed to show a sufficiently serious medical condition approaching a condition of urgency, extreme pain, or death. *Chance,* 143 F.3d at 702–03.

Furthermore, Byng has failed to present admissible evidence showing that Dr. Mamis's decision was not the product of his own medical judgment. Dr. Mamis first saw Byng on September 27, 2007, during which Dr. Mamis found "no reason" for a neutropenia consultation with Dr. Rush. (Kim Decl. Ex. D at 35.) At the time, Dr. Mamis was in possession of Byng's August 2007 blood test results, which showed an ANC level at 984 (*id.* at 70), as well as Byng's prior medical records listing multiple instances in which Byng refused neupogen. (*Id.* at 229, 238.) Dr. Mamis concluded that based on Byng's stable ANC level and history of side effects with neupogen, further treatment was not indicated. (Mamis Decl. ¶ 13.) "The defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere." *Salahuddin,* 467 F.3d at 281. Beyond the allegations in his Amended Complaint, Byng offers no evidence that Dr. Mamis was aware of and consciously disregarded a substantial risk of serious harm to Byng's health in not referring him to Dr. Rush. *Farmer,* 511 U.S. at 835–37. "[D]ifference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under [section] 1983." *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867 (2d Cir.1970).

Byng's final allegation against Dr. Mamis—that he refused to change his "soiled, leaking" dressing after his hernia surgery—also fails under both prongs of the deliberate indifference standard. (Am.Compl.¶ 68.) This allegation does not rise to "a condition of urgency[ ]

that may produce death, degeneration, or extreme pain." *Hathaway,* 99 F.3d at 553. Byng has not shown that his temporarily soiled dressing "significantly affect[ed] his daily activities" or caused him "chronic and substantial pain." *Chance,* 143 F.3d at 70203. Byng has also failed to come forward with sufficient evidence which, if believed, would permit a reasonable fact-finder to find in his favor on deliberate indifference under the subjective prong. Byng offers no evidence that Dr. Mamis was present during Byng's surgery or was responsibility for changing his dressing. Dr. Mamis swore in his declaration that he has "never changed a patient's dressing." (Mamis Decl. ¶ 14.) Byng has come forward with no admissible evidence showing that Dr. Mamis was deliberately indifferent in not doing so in his case.

*13 For the foregoing reasons, summary judgment is granted as to Byng's claims against Dr. Mamis.

### c. *Dr. D'Silva*

Byng alleges that Dr. D'Silva was deliberately indifferent to his serious medical needs by "failing to act on repeated request[s]" for dental treatment. (Am.Compl.¶ 68.) An unresolved dental condition may be sufficiently serious to support an Eighth Amendment claim. *See Chance,* 143 F.3d at 702. "A cognizable claim regarding inadequate dental care, like one involving medical care, can be based on various factors, such as the pain suffered by the plaintiff, the deterioration of the teeth due to a lack of treatment, or the inability to engage in normal activities." *Id.* (internal citations omitted). A dental condition is sufficiently serious if it causes the prisoner "great pain, difficulty in eating, and deterioration of [his] other teeth." *Brock,* 315 F.3d at 162–63 (citing *Chance,* 143 F.3d at 702–03). This Court assumes that the delay in Byng's dental treatment amounted to a sufficiently serious medical condition.

"[I]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 31 F.3d 496, 501 (2d Cir.1994). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009). In fact, "[i]n a § 1983 suit or a *Bivens* action—where masters do not answer for the torts

Byng v. Wright, Not Reported in F.Supp.2d (2012)
Case 9:17-cv-00126-GTS-TWD    Document 15    Filed 12/22/17    Page 22 of 54
2012 WL 967430

of their servants—the term 'supervisory liability' is a misnomer." *Id.* Accordingly, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* "Thus, under *Iqbal,* a defendant can be liable under section 1983 only if that defendant took an action that deprived the plaintiff of his or her constitutional rights," either through direct participation or by creating a custom or policy under which unconstitutional practices occurred. *De La Rosa v. N.Y. City 33 Precinct,* 2010 WL 1737108, at *4 & n. 2 (S.D.N.Y. April 27, 2010) (citing *Bellamy v. Mt. Vernon Hosp.,* 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009)).

Byng has failed to come forward with admissible evidence supporting Dr. D'Silva's direct participation in the delay in Byng's dental treatment. First, Dr. D'Silva was the State Dental Director for the entire DOCS system. She was not a dentist at Fishkill, and did not work at the Fishkill Dental Clinic. (D'Silva Decl. ¶¶ 1, 4.) Nor did she schedule dental appointments for inmates. (D'Silva Reply Decl. ¶ 7.) As State Dental Director, Dr. D'Silva worked in DOCS' central office in Albany. (D'Silva Reply Decl. ¶ 6.) Byng comes forward with no evidence showing that Dr. D'Silva's participated in scheduling or denying him dental treatment. (*Cf. id.* ¶¶ 4, 7, 12.) Mere proof of Dr. Silva's "linkage in the prison chain of command" is insufficient to impose liability under section 1983. *Avers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1983).

**\*14** Furthermore, Byng has not come forward with sufficient evidence to permit a reasonable fact-finder to find that Dr. D'Silva created a policy or custom of denying Byng dental treatment. No admissible evidence indicates Dr. D'Silva received or responded to any of Byng's complaints, or that she was responsible for scheduling or approving dental appointments at Fishkill or any other DOCS facility. (D'Silva Reply Decl. ¶¶ 37.) Byng also offers no evidence disputing the daily operating hours for Fishkill's Dental Clinic or the Sick Call procedure, neither of which required an appointment. Instead, Byng alleges that on two occasions unnamed Fishkill housing officers denied him a Sick Call pass, but offers no evidence of their identities, whether they reported to Dr. D'Silva, or whether they were acting pursuant to a policy created by Dr. D'Silva. Moreover, Byng's dental records show that he received treatment at the Dental Clinic twice using the Sick Call method. (Kim Decl. Ex. G at 389.) [2]

[2]    Indeed, Byng admits that he "finally called down to" the Dental Clinic to receive treatment in early 2009. (Pl.'s 56.1 Resp. ¶ 20.)

Byng alleges that Dr. D'Silva "purposely ignored [his] numerous requests" for dental care (Byng Dep. at 61, 66), but offers no admissible evidence that Dr. D'Silva ever received or reviewed any such requests. Indeed, Dr. D'Silva swore under oath that no inmate complaint would have been sent to her even if it were directly addressed to her. (D'Silva Reply Decl. ¶¶ 3, 4.) Dr. D'Silva swore she never received any correspondence from Byng, never corresponded with an inmate, and did not sign the Dental Clinic response forms Byng received on April 9, 2008 and June 10, 2008 allegedly bearing her signature. (*Id.* at ¶¶ 3–6; Pl.'s Mem. L. Opp. at C7, C9.) [3] Byng's unsworn writings do not raise a genuine issue of material fact as to this allegation. *See, e.g., Tarullo v. Def. Contract Audit Agency,* 600 F.Supp.2d 352, 360 (D.Conn.2009) ("Because the Plaintiff presents no evidence rebutting [Defendant]'s affidavit [that Defendant had no access to Plaintiff's records], he has not demonstrated the existence of an issue of fact for the jury to decide."); *Blanc v. Sagem Morpho, Inc.,* 2009 WL 1813236, at *8 & n. 6 (E.D.N.Y. June 25, 2009) ("As unsworn statements, [plaintiff's] letters are inadmissible in opposition to summary judgment, but even if they were admissible, they do not contradict Defendants' evidence" contained in sworn declaration).

[3]    Dr. D'Silva swore that the signature on these forms were not signed by her and do not reflect her handwriting. (D'Silva Reply Decl. ¶ 5.)

Even had Dr. D'Silva received Byng's complaints, "an allegation that a prison official received correspondence and did not act on it does not state a claim for personal involvement under section 1983." *Johnson v. Wright,* 234 F.Supp.2d 352, 364 (S.D.N.Y.2002), *rev'd on other grounds,* 412 F.3d 398 (2d Cir.2005). The Supreme Court explicitly rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Iqbal,* 129 S.Ct. at 1949. Even prior to *Iqbal,* it was "well-established that an allegation that an official ignored a prisoner's letter of protest ... is insufficient to hold that official liable for the alleged violations." *Accord Johnson,* 234 F.Supp.2d at 363 (collecting cases); *Johnson v. Goord,* 2004 WL 2199500, at *7 (S.D.N.Y. Sept.29, 2004) ("[T]he receipt of letters or grievances or complaints from inmates is insufficient to impute personal involvement.").

**\*15** Although a DOCS employee once wrote to Byng that "the delay in [Byng] being seen was due to staff shortages" (Pl.'s Mem. L. Opp. Ex. C16), Byng offers no evidence that Dr. D'Silva authorized or adopted this letter, was aware of its contents, or was responsible for staff shortages at the Fishkill facility. "To defeat summary judgment," the non-movant "must do more than simply ... rely on conclusory allegations or unsubstantiated speculation." *Jeffreys,* 426 F.3d at 554. Even were the Court to attribute Bellamy's statement to Dr. D'Silva, "[e]vidence of understaffing, without more, is not proof of official policy." *Clay v. D'Silva,* 2011 WL 1135939, at \*3 (N.D.N.Y. Feb.1, 2011). Understaffing may support a section 1983 claim "only if more complete funding and staffing were possible, and ... it was the deliberate intent of the policy making official not to adequately fund and staff the jail, having in mind a gross indifference to the medical needs of ... detainees." *Id.* (internal citations omitted). Byng adduces no such evidence as to Dr. D'Silva's intent to do so in this case. Accordingly, summary judgment is granted as to Byng's claims against Dr. D'Silva.

### d. *Dr. Samad*

Byng's allegations against Dr. Samad arise from Byng's January 2009 dental appointment. Byng alleges that Dr. Samad "intentionally banged" on Byng's tooth with a mirror instrument "once or twice," and "yanked" Byng's neck backward while sitting in a dental chair. (Am.Compl.¶ 60.) Byng allegedly sustained a sore neck for which he did not seek further treatment or medical attention. (Byng Dep. at 65.)

Viewed in their most favorable light, these allegations do not constitute a sufficiently serious medical condition under the deliberate indifference standard. They do not present "a condition of urgency[ ] that may produce death, degeneration, or extreme pain." *Hathaway,* 99 F.3d at 553. Nor do they "violate contemporary standards of decency." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002.) Byng's allegations, accepted as true, constitute "minor discomfort or injury" insufficient to carry his burden under the objective prong. *Martinez v. Glover,* 2001 WL 1491278, at \*4 (S.D.N.Y. Nov.26, 2001); *see, e.g., Banks v. Stewart,* 2010 WL 2697075, at \*15 (S.D.N.Y. July 6, 2010)* (Sullivan, J.) (cut finger "simply was not sufficiently serious to satisfy the objective" prong); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 306–11 (S.D.N.Y.2001) (bleeding finger); *Bonner v. N. Y. City Police Dep't,* 2000 WL 1171150, at \*4 (S.D.N.Y. Aug.17, 2000) (swollen hand). Summary judgment is therefore granted as to Byng's claims against Dr. Samad.

### CONCLUSION

For the reasons stated above, the defendants' motion to dismiss (Docket # 31) is GRANTED. The Clerk shall close the case and enter judgment for the defendants. Byng has not made a substantial showing of the denial of a constitutional right and, accordingly, a certificate of appealability will not issue. 28 U.S.C. § 2253: *see Lozada v. United States,* 107 F.3d 1011, 1016–17 (2d Cir.1997), *abrogated on other grounds by United States v. Perez,* 129 F.3d 255, 25960 (2d Cir.1997). This Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and in forma pauperis status is denied.

**\*16** Counsel for the defendants are directed to provide to the plaintiff copies of all unreported cases cited herein.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 967430

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Kucharczyk v. Westchester County, S.D.N.Y., March 26, 2015

2010 WL 338081
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Michael McQUEEN, Plaintiff,
v.
COUNTY OF ALBANY; Thomas
Wigger, Superintendent, Albany
County Correctional Facility; and
Correctional Medical Services, Defendants.

No. 9:08-CV-799.
|
Jan. 28, 2010.

**Attorneys and Law Firms**

Michael McQueen, Stormville, NY, pro se.

Napierski, Vandenburgh & Napierski, L.L.P., Shawn F. Brousseau, Esq., of Counsel, Albany, NY, for Defendants County of Albany and Thomas Wigger.

Thuillez, Ford, Gold, Butler & Young, L.L.P., Kelly Monroe, Esq., of Counsel, Albany, NY, for Correctional Medical Services.

Michael McQueen, Dannemora, NY, pro se.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

 **\*1** Plaintiff, Michael McQueen, brought this civil rights action in July 2008, pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated December 22, 2009, the Honorable David E. Peebles, United States Magistrate Judge, recommended that defendants' motions for summary judgment (Docket Nos. 19 and 22) be granted in relevant part, and that all of plaintiff's claims against defendants be dismissed, with prejudice with

respect to plaintiff's federal claims, but without prejudice to his right to assert any pendent state law claims in an appropriate state court. The plaintiff has filed objections to the Report-Recommendation. Defendants County of Albany and Thomas Wigger have filed a response to the plaintiff's objections to the Report/Recommendation claiming, among other things, that the objections were filed untimely. Defendant Correctional Medical Services has filed a response to the plaintiff's objections to the Report/Recommendation also claiming, among other things, that the objections were filed untimely.

Based upon a de novo review of the portions of the Report-Recommendation to which the plaintiff has objected and to which the defendants have filed responses, the Report-Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that

1. Defendants' motions for summary judgment (Docket Nos. 19 and 22) are GRANTED, in relevant part;

2. All of plaintiff's claims against defendants are DISMISSED, with prejudice with respect to his federal claims, but without prejudice to his right to assert any pendent state law claims in an appropriate state court;

3. The Clerk is directed to file judgment accordingly and close the file.

IT IS SO ORDERED.

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Michael McQueen, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights arising out of his pretrial detention at the Albany County Correctional Facility. In his complaint, plaintiff alleges that he slipped and injured himself while exiting a shower area and was thereafter denied medical treatment, in violation of his constitutional rights.

Currently pending before the court are two separate but similar motions by the defendants for summary judgment dismissing plaintiff's claims against them. In their motions, defendants argue that plaintiff's claims against them are subject to dismissal on a variety of grounds, including procedurally based upon his failure to exhaust available administrative remedies before commencing suit, and on the merits. Having carefully considered the record now before the court in light of defendants' arguments and plaintiff's failure to properly oppose the defendants' motions, while I find the existence of triable issues of fact surrounding the defense of exhaustion, precluding dismissal on this procedural basis, I recommend that the motions be granted, in relevant part, and that plaintiff's complaint be dismissed on the merits.

I. *BACKGROUND* [1]

[1]    In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.2d 128, 137 (2d Cir.2003). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

**\*2** After being arrested on charges not disclosed in the record, plaintiff was temporarily housed at the Albany County Correctional Facility ("ACCF") as a pretrial detainee from October 2, 2007 until March 19, 2008, when he was transferred into the custody of the New York State Department of Correctional Services (the "DOCS"). *See* ACCF Medical Record (Dkt. No. 22-5). Upon his arrival at ACCF, plaintiff was screened by defendant Correctional Medical Services and found to have no physical complaints. *See id* .

On January 22, 2008, as he was exiting the facility's shower area, McQueen slipped on a puddle of water and fell.[2] Complaint (Dkt. No. 1) p. 3. When he slipped, plaintiff "pulled" his right side and felt a sharp pain in the lower right side of his abdomen. *Id.* Plaintiff reported this incident and his injury to the corrections officer on duty and was told to complete a sick call request. *Id.*

[2]    There is some discrepancy in the record as to the date of plaintiff's accident. In his complaint and during his deposition testimony, plaintiff alleged that the incident occurred on January 22, 2008. *See*

Complaint (Dkt. No. 1) p. 3; *see also* Deposition Transcript ("Tr.") (Dkt. No. 19-5) p. 19. Later during his deposition, however, plaintiff testified that the incident occurred on January 14, 2008, which coincides with the date of his first sick call request. Tr. (Dkt. No. 19-5) pp. 21-22.

The first request for health services from plaintiff contained in the record relating to a problem on his right side is dated January 14, 2008, and states, "I believe I have an [sic] hernia on my top right side, witch [sic] is causing me discomfort and pain." [3] *See* ACCF Medical Record (Dkt.22-5); *see also* Tr. (Dkt. No. 19-5) pp. 21-22. McQueen was seen by a nurse the following day, who consulted with a physician and prescribed Motrin for his pain. *See* ACCF Medical Record (Dkt. No. 22-5). Plaintiff was administered Motrin over the period of January 15 through 25, 2008. *See id.*

[3]    Plaintiff testified that the January 14, 2008 request was his second, and that he never received a copy of the first one that he filled out. Tr. (Dkt. No. 19-5) p. 22. Plaintiff did not identify the date or testify as to the substance of the first request.

On January 31, 2008, plaintiff lodged another complaint of a right side hernia and requested to see a doctor. *See* ACCF Medical Record (Dkt. No. 22-5). Plaintiff was seen the following day by a physician's assistant, who prescribed a ten-day supply of Motrin to be taken at night for the pain. Tr. (Dkt. No. 19-5) p. 23. On that occasion, McQueen was told that the physical examination revealed a small lump, but there was nothing more that could be done for him. *Id.* at 24.

The record reflects that McQueen did not complain about his condition again until more than two weeks later when, on February 17, 2008, he completed another request for health services identifying a right side hernia and pain. *See* ACCF Medical Record (Dkt. No. 22-5). Plaintiff was again seen the following day by a member of the facility's medical staff, on this occasion a nurse. *Id.* The record of plaintiff's examination on that date reveals a diagnosis of "intermittent bulging [of the] upper right inguinal area with discomfort", and notes plaintiff's request to see a physician. *Id.*

Plaintiff was examined on February 19, 2008 by Dr. Michael Salzman. Tr. (Dkt. No. 19-5) p. 25; *see also* Affidavit of Michael A. Salzman, M.D. ("Salzman Aff.") (Dkt. No. 22-9) ¶ 6. Based upon his examination, Dr.

Salzman diagnosed McQueen as suffering from a mild right side femoral hernia, one-half centimeter in size, with an estimated onset of about two months.[4] *See* ACCF Medical Record (Dkt. No. 22-5). Dr. Salzman states that although plaintiff wrote on the health services request form that he was experiencing pain, McQueen did not voice any complaints of pain during his visit of February 19, 2008, and the doctor's examination revealed no objective or subjective signs of pain. Salzman Aff. (Dkt. No. 22-9) ¶ 6.

[4]    Plaintiff testified to having experienced a hernia when he was a child, and that he had it surgically repaired. Tr. (Dkt. No. 19-5) at pp. 13-14.

**\*3** According to Dr. Salzman, a mild hernia does not require surgical intervention provided that it is not incarcerated. Salzman Aff. (Dkt. No. 22-9) ¶ 7. Upon examination of plaintiff's hernia, Dr. Salzman determined that it was not. *Id.* Dr. Salzman advised plaintiff of his diagnosis as well as the fact that the hernia was not life threatening and did not require immediate surgery. Tr. (Dkt. No. 19-5) p. 25. Dr. Salzman recommended to plaintiff that if he was going home, he should see his own medical provider regarding removal of the hernia, adding that if he was being transferred to the custody of the DOCS, it would be that agency's responsibility to treat him. *Id.* at pp. 25-26. Dr. Salzman provided plaintiff with 650 milligrams of Tylenol and a stool softener, which was administered from February 19 through 29, 2008, and released him back to his unit. *Id.*

The following day, plaintiff left ACCF for a court appearance and subsequently was transferred into the custody of the DOCS. Tr. (Dkt. No. 19-5) p. 26. Since that time McQueen has not had surgery to repair the hernia, takes ibuprofen occasionally for pain, and has only been restricted in his ability to work out and lift a coffee urn. *Id.* at pp. 27, 33.

Albany County Sheriff James L. Campbell reports that a review of ACCF records reflects that plaintiff did not file any informal or formal grievances or grievance appeals while housed at that facility. Affidavit of James L. Campbell ("Campbell Aff.") (Dkt. No. 19-10) ¶ 5. According to the plaintiff, however, on January 30, 2008, while still housed at ACCF he hand wrote a document labeled by him as an "inmate grievance complaint to Albany County Correctional Facility", complaining of a dangerous slippery condition resulting from a puddle

in the shower area where his accident occurred and requesting the installation of rubber mats to prevent future similar occurrences. *See* Attachment to Complaint (Dkt. No. 1). The written complaint did not include any reference to his injuries or complaints regarding his medical treatment. Plaintiff also wrote a letter to Superintendent Wigger on February 8, 2008, referencing his earlier grievance, advising of his accident and injuries, and on this occasion complaining that he was denied medical treatment. *See id.* Plaintiff received no response to either the grievance or his letter, nor did he take any further action regarding the complaints voiced in those documents. Tr. (Dkt. No. 19-5) pp. 30, 38.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on July 23, 2008, and was thereafter granted leave to proceed *in forma pauperis.* Dkt. Nos. 1, 8. His complaint names three defendants, including the County of Albany; Thomas Wigger, the superintendent of the ACCF; and Correctional Medical Services. In it, plaintiff asserts a claim of cruel and unusual punishment based upon an alleged deliberate indifference of medical officials to the hernia allegedly sustained after he slipped and fell. As relief, plaintiff seeks compensatory damages.

**\*4** Following joinder of issue and the close of discovery, all defendants moved for summary judgment dismissing plaintiff's claims against them on a variety of grounds.[5] Dkt. Nos. 19, 22. In their motions, defendants argue that 1) plaintiff's claims are subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit; 2) plaintiff has failed to demonstrate entitlement to compensatory damages; 3) plaintiff cannot establish deliberate indifference to a serious medical need; 4) plaintiff's claims against the superintendent of the facility must be dismissed for lack of personal involvement; 5) plaintiff has failed to demonstrate a sufficient basis for holding Albany County or Correctional Medical Services liable; and 6) plaintiff's pendent state law claims, if any, are barred by virtue of his failure to file a notice of claim.

[5]    The County of Albany and defendant Wigger are jointly represented by counsel, and Correctional Medical Services is separately represented by another attorney. The defendants have filed two separate but similar motions for summary judgment.

Despite the passage of the deadline for doing so, which was extended upon his request, *see* Text Order of March 16, 2009, plaintiff has failed to respond to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) (B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears the initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538

(1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

#### B. *Plaintiff's Failure to Oppose Defendants' Motions*

Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motions, and specifically whether that failure automatically entitles defendants to dismissal of plaintiff's complaint, based upon their motions.

Undeniably, *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). Despite this measure of deference, the failure of an unrepresented plaintiff to oppose a summary judgment motion does not preclude the court from deciding the motion. *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at \*2 (N.D.N .Y. May 22, 1998) (Pooler, J. & Hurd, M.J.) [6] ; *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at \*1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). Before such a motion can be granted under such circumstances, however, the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2001) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.); *see also* N.D.N.Y.L.R. 7.1(b)(3).

6  Copies of all unreported decisions cited in this document have been appended for the convenience of

the *pro se* plaintiff. [Editor's note: Copies accessible on Westlaw as separate documents.]

While a plaintiff's failure to properly oppose a defendant's motion does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. This court's rules require that "[a]ny motion for summary judgment shall contain a Statement of Material Facts setting forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." N.D.N.Y.L.R. 7.1(a)(3). By electing not to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have routinely invoked Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement. [7] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

[7]     According to Local Rule 7.1(a)(3), *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." See* N.D.N.Y.L.R. 7.1(a)(3) (Emphasis in original).

**\*6** I recommend that the court follow this well-established practice when reviewing defendants' motions for facial sufficiency, and notwithstanding McQueen's *pro se* status, accept the facts set forth in defendants' Local Rule 7.1(a)(3) Statements as uncontroverted, in light of plaintiff's failure to respond to those statements.

### C. Failure to Exhaust

While plaintiff's complaint alleges that he exhausted available administrative remedies before commencing suit, and attaches two documents which he claims to have filed with officials at ACCF complaining of the dangerous condition in the shower and subsequently of the alleged denial of medical treatment for his injuries, Albany County and defendant Wigger assert that a review of ACCF records shows that plaintiff filed no grievances or appeals while housed at that facility. Defendants therefore argue that plaintiff failed to avail himself of the inmate grievance procedure available at ACCF and

that having failed to exhaust administrative remedies, he cannot now maintain this action.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan.31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 204, 127 S.Ct. 910, 914-15, 166 L.Ed.2d 798 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, any unexhausted claims are subject to dismissal. *See Pettus v. McCoy,* No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,*

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson,* 380 F.3d at 697-98) (emphasis omitted).

**\*7** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.[8] *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed algorithm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[9] *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686.

[8] As will be seen, whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation. *See, e.g., Newman v. Duncan,* No. 04-CV-395, 2007 WL 2847304, at \* 2 n. 4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. & Homer, M.J.).

[9] In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at \*8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

a) *Availability of Remedy*

The record reveals that inmates at ACCF have available to them an inmate grievance procedure ("IGP") for complaining of conditions of their confinement. Brousseau Aff. (Dkt. No. 19-2) Exh. F. That policy sets forth both informal and formal channels for handling grievances, providing for grievance forms to be made available to inmates, and refers inmates to the inmate handbook for further instructions. *Id.*

Despite an inmate's entitlement to file and pursue a grievance in accordance with the IGP prescribed by ACCF, there are circumstances under which the grievance procedure nonetheless could be deemed not to have been available to the plaintiff. *See Hemphill,* 380 F.3d at 687-88. Thus, for example, "[e]xhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, ... or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove,* 2007 WL 389003, at \*8 (citations omitted) (noting, for example, that a defendant's failure to advance plaintiff's grievances or the issuance of threats against an inmate to deter the filing of a grievance may effectively render the administrative process unavailable). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff refrain to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 38 F.3d at 688 (quotations and citations omitted); *see also Hargrove,* 2007 WL 389003, at \*8 n. 15.

b) *Presentation of Defense/Estoppel*
**\*8** The second prong of the *Hemphill* analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted).

c) *Special Circumstances*
The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing

a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676-77; *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Hemphill,* 380 F.3d at 688).

In this case, the first prong of the *Hemphill* test is easily satisfied. As was previously discussed, defendants have produced a copy of the Albany County Sheriff's Department's Inmate Grievance Procedure, which is applicable to inmate grievances at ACCF. It thus appears that there was an internal remedy available to the plaintiff.

As to the second and third prongs of the analysis, however, they are not so easily dispensed with. The evidence in the record bearing upon the issue of whether plaintiff filed any grievance related to the matters set out in his complaint is equivocal. Based upon the record before the court it appears that on January 30, 2008 plaintiff submitted a written complaint, designated as an "inmate grievance complaint", though not filed utilizing the prescribed form, complaining of a constant puddle in the shower area creating a slippery condition and requesting the installation of rubber mats; no mention is made in that letter of the failure to provide requested medical treatment. The record also reveals that just over a week later, on February 8, 2008, plaintiff wrote a letter to Superintendent Wigger, in which he referenced his earlier grievance and also alleged that he had slipped and fallen in a puddle in the shower area, causing him to sustain a hernia, and also complained that he had been refused medical treatment, in violation of his Eighth Amendment rights. *See* Attachments to Complaint (Dkt. No. 1). Plaintiff admits that he did not receive any response to either his grievance or the letter to defendant Wigger, and that he did not file any other grievances or appeals regarding the incidents at issue. It is unclear whether defendants dispute having received the documents attached to plaintiff's complaint. In support of their motion, they merely assert somewhat obliquely that a review of ACCF records reveals that McQueen did not file any informal or formal grievances or appeals.

*9 Undeniably, the document that plaintiff labeled as an inmate grievance does not complain of medical indifference. Plaintiff's subsequent letter of February 8, 2008, however, does include this complaint. Ordinarily, under an analogous procedure prescribed for use by New York State prison inmates, letters to DOCS employees and officials are not considered as sufficient to satisfy the grievance exhaustion requirement. *See Colon v. Farrell,* No. 01-CV6480(FE), 2004 WL 2126659, at *5 (W.D.N.Y. Sept.23, 2004) (noting that "letters of complaints to DOCS employees and officials do not satisfy the grievance procedure exhaustion requirement"); *Conner v. Hurley,* No. 00 Civ. 8354(LTS)(AJP), 2004 WL 885828, at *2 (S.D.N.Y. Apr. 26, 2004) (letters to facility superintendent and DOCS commissioner "may not be deemed substitutes for strict compliance with requirements of the IGP").

In this case, the IGP at issue outlines a protocol for inmates to follow in registering both informal and formal complaints. *See generally* Albany County Sheriff's Dep't IGP (Dkt. No. 19-8). In accordance with the formal process, the Tour Commander is required to provide assistance to an inmate in the preparation of the written grievance "if assistance is requested or obviously necessary because of language barriers or literacy problems." *Id.* at § II .G. While an inmate grievance form is attached to the IGP, the written procedures provided to the court do not explicitly mandate that an inmate utilize that form and, more importantly, the procedure does not expressly identify with whom a written grievance must be filed. [10] In fact, the Albany County Sheriff's Department grievance procedure seems to require an effort at informal resolution before the formal process is instituted and, in the event that the informal process is unsuccessful, appears to delegate the responsibility of initiating the formal grievance process to a corrections officer. *See id.* at §§ II.F and II.G.

[10]    A note appearing at the end of the Albany County Sheriff's Department IGP states, "NOTE: Inmate instructions regarding filing grievances are contained within the Inmate Rules and Regulations Handbook." No further information regarding the Inmate Rules and Regulations Handbook has been provided to the court, and there is nothing before the court that contradicts my analysis of the relevant procedures as discussed above.

When viewed in light of the Albany County Sheriff's Department's prescribed procedures, it is at least

arguable that plaintiff's February 8, 2008 letter to the superintendent sufficed as an informal grievance and placed defendants on notice of plaintiff's complaint. It is not clear whether Superintendent Wigger denies receiving the letter. It is obvious, however, that this unresolved issue raises a material question of fact as to whether defendants' actions, or inaction, interfered with McQueen's ability to exhaust administrative remedies. Conceivably, plaintiff's letter was delivered to the superintendent, and by their inaction defendants prevented plaintiff from pursuing available internal remedies. Drawing all inferences and resolving all ambiguities in plaintiff's favor, I am therefore unable to say no reasonable factfinder could conclude that plaintiff did not properly apprise defendants, both procedurally and substantively, of his claim concerning medical indifference, and therefore recommend denial of the portion of defendants' motions seeking dismissal of plaintiff's claim for failure to exhaust.

### D. *Plaintiff's Medical Indifference Claims*

**\*10** The centerpiece of plaintiff's complaint in this action is his claim that he was denied medical treatment for the injuries allegedly sustained after he slipped and fell. In their motions, defendants assert that the record does not support a finding of liability on plaintiff's medical indifference claim, both because plaintiff's condition was not sufficiently serious and because defendants were not indifferent to that condition.

As a pretrial detainee, plaintiff's conditions of confinement were subject to safeguards emanating from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which governs such claims brought by inmates serving prison sentences. *Benjamin v. Fraser,* 343 F.3d 35, 49-50 (2d Cir.2003). In *Benjamin,* the Second Circuit acknowledged the government's duty to assume responsibility for the safety, general well-being, and basic human needs of those whose liberty it involuntarily restrains, and specifically distinguished between the circumstances presented by a pretrial detainee, who is still presumed innocent, and an inmate who has been convicted of a crime. *Id.* at 50-51. Following *Benjamin,* however, there was significant uncertainty surrounding the precise standard to be applied to claims of deliberate medical indifference brought by pretrial detainees. While it was clear that such claims were subject to analysis under the Due Process Clause of the Fourteenth Amendment, *Bryant v. Maffucci,* 923 979, 983 (2d Cir.1991), the precise contours of the

obligation imposed thereunder had not been definitively established by the Second Circuit until its recent decision in *Caiozzo v. Koreman,* wherein the court pronounced that "[c]laims for deliberate indifference to a serious medical condition or other serious threat to health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." 581 F.3d 63, 72 (2d Cir.2009).

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle).* While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291.

### 1. *Serious Medical Need*

**\*11** In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must first allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132,

136-37 (2d Cir.2000) (quoting, *inter alia*, *Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment", a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 701 (citation and internal quotations omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV0774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

In this instance, the record leads invariably to the conclusion that plaintiff's hernia is not objectively sufficient to qualify as constitutionally significant. There is no indication that plaintiff's condition was emergent or one that could produce death, degeneration, or extreme pain. Plaintiff's subjective complaints of pain are not substantiated by any objective evidence, and he variously described what he felt as "discomfort" and "pain." After his first two requests for treatment, which came a week apart, plaintiff did not require medical services again until more than two weeks later, all suggesting that plaintiff was by no means in constant or extreme pain, or suffering from a dire physical condition.

Significantly, Dr. Salzman states that plaintiff did not voice any complaints of pain during his examination of February 19, 2009, the hernia was not incarcerated and therefore did not necessitate surgery, and any surgery at that time would have been merely elective. Dr. Salzman's opinion is buttressed by the fact that even as of the time of his deposition, approximately ten months after the treatment complained of, plaintiff had not undergone surgery and, by his own admission, experienced pain only occasionally. The evidence thus establishes that, at worst, plaintiff's hernia caused him to suffer intermittent pain and/or discomfort, which is patently insufficient to objectively prove that his condition was serious. Indeed, other courts have recognized that an inguinal hernia is not objectively serious enough to satisfy the objective prong of the Eighth Amendment test. *Arroyo v. City of New York,* No. 99 Civ. 1458, 2003 WL 22211500, at *2-3 (S.D.N.Y. Sept. 25, 2003); *see also, Day v. Lantz,* No. 3:07-CV-388, 2009 WL 801612, at *3 (D.Conn. Mar. 25, 2009) (citing cases).

*12 For these reasons, I find that plaintiff's hernia was not sufficiently serious to warrant constitutional protection.

### 2. *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on a medical indifference claim a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Leach v. Dufrain,* 103 F.Supp.2d 546. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo v. Goord,* No. 97-CV-1325, 1998 WL 713809, at *2 (same) (N.D.N.Y. Oct. 1, 1998) (Kahn, D.J. & Hurd, M.J.).

It should be noted that the constitution does not afford prisoners a right to medical treatment of their choosing; the question of that diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998) (citation omitted). "Charges that amount only to allegations of malpractice, and mere disagreements with respect to quality of medical care do not state an Eighth Amendment claim." *Arroyo,* 2003 WL 22211500, at * 2 (citing *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 292).

The record now before the court overwhelmingly demonstrates the lack of merit of this prong of plaintiff's claim of deliberate indifference. The evidence in the record flatly contradicts the notion that plaintiff was exposed to an excessive risk to his health and safety. Each time plaintiff requested medical attention he was seen within twenty four hours, and on each occasion was examined and given medication for pain. At best, plaintiff's apparent complaint that the hernia was not surgically removed amounts to nothing more than a disagreement as to the method of treatment and fails to rise to the level of

indifference necessary to support a medical indifference claim under the Fourteenth Amendment. *See Wandell v. Koenigsmann,* 99-CV-8652, 2000 WL 1036030, at *5 (S.D.N.Y. July 27, 2000) (differences in opinion between a doctor and a prisoner over appropriate medication is simply disagreement over treatment plan and does not implicate the Eighth Amendment); *see also Grant v. Burroughs,* 96-CV-2753, 2000 WL 1277592, at *5 (S.D.N.Y.Sept.8, 2000) (prisoner denied pain medication does not have a constitutional right to treatment of his choice). Accordingly, even if plaintiff's hernia were sufficiently serious to implicate the due process clause of the Fourteenth Amendment, the evidence shows that defendants were not deliberately indifferent to that medical need.

## IV. *SUMMARY AND CONCLUSION*

**\*13** This action stems from an alleged slip and fall in the shower occurring on January 14, 2008, as a result of which plaintiff claims to have sustained a hernia. Thereafter, plaintiff contends, he requested but was denied medical treatment for his injuries. Although defendants have asserted that the action must be dismissed as a result of plaintiff's failure to exhaust administrative remedies, the record establishes the existence of triable issues of material fact in this regard, and I am therefore not recommending dismissal on this procedural basis at this juncture. As to the merits of plaintiff's medical indifference claim, however, the record now before the court firmly establishes that plaintiff's condition was not sufficiently serious to trigger constitutional protection and, moreover, that he was provided with timely and adequate medical treatment each time it was requested. I therefore recommend dismissal of plaintiff's medical indifference claim on the merits, and in light of that recommendation have not addressed the other arguments raised in the defendants' motions.[11]

[11]    To the extent that plaintiff's complaint may be regarded as encompassing state law claims against defendants, I recommend that the court not exercise pendent jurisdiction of such claims, "pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline supplemental jurisdiction over a state claim

if all of the claims over which the court had original jurisdiction were dismissed ." *Stephenson v. Albany County Policymakers,* Civ. No. 6:09-CV-326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug.14, 2009) (Kahn, J. & Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)). In light of this recommendation, I have declined to address defendants' argument that plaintiff's state law claims must be dismissed for failure to file a notice of claim.

Based upon the foregoing it is hereby

RECOMMENDED, that defendants' motions for summary judgment (Dkt. Nos. 19 and 22) be GRANTED, in relevant part, and that all of plaintiff's claims against defendants be DISMISSED, with prejudice with respect to plaintiff's federal claims, but without prejudice to his right to assert any pendent state law claims in an appropriate state court.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a) and (d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules, and to mail an additional copy, addressed to the plaintiff at the Green Haven Correctional Facility.[12]

[12]    Plaintiff is listed on the docket sheet as being confined in the Clinton Correctional Facility. A search of the New York State Department of Correctional Services inmate locator website, however, reflects that he may now be housed in the Green Haven Correctional Facility. If so, then plaintiff has failed to fulfill his obligation to notify the court of any change of address while this action is pending. *See* N.D.N.Y.L.R. 10.1(c).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 338081

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by D'Attore v. Cucharella, N.D.N.Y., October 3, 2012

2011 WL 856426
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

James PINE, et al., Plaintiff,
v.
Greg SEALLY, et al., Defendants.

No. 9:09–CV–1198 (DNH/ATB).
|
Feb. 4, 2011.

**Attorneys and Law Firms**

Abul Labib, Wilton, NY, pro se.

Harold Burroughs, Jr., Dannemora, NY, pro se.

Cleon Taylor, Attica, NY, pro se.

Barry D. Irvis, Malone, NY, pro se.

Lee Goergen, Malone, NY, pro se.

Jonathan M. Bernstein, William J. Greagan, Goldberg, Segalla Law Firm, Adrienne J. Kerwin, Office of Attorney General Albany, NY, for Defendants.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). The case was transferred to me on January 4, 2010, following the retirement of U.S. Magistrate Judge Gustave J. Di Bianco. (Dkt. No. 15).

Plaintiffs filed this civil rights complaint, pursuant to 42 U.S.C. § 1983, regarding incidents that occurred during their incarceration at Greene County Jail ("Greene").[1] Robert Cuttita and Deborah Clark ("State Defendants") filed a motion to dismiss plaintiffs' complaint ("State Defendants' Motion") on March 17, 2010. (Dkt. No. 22). Defendants Peter Bennett, Hulbiki, John Jarvis, Donna Juliano, Ken Liese, Brian McMannis, Gregory Seeley, Donnie Skimmerhorn, Michael Spitz, Mike

Sutherland, Edward Vorheese, Ed Warga, and Steven Worth ("County Defendants") filed a motion to dismiss plaintiff's complaint ("County Defendants' Motion") on April 15, 2010. (Dkt. No. 49). Plaintiff Burroughs filed a response (Burroughs's Response) to the State Defendants' Motion and the County Defendants' Motion on June 22, 2010. (Dkt. No. 55). The county defendants filed a memorandum of law in reply and in further support of their motion to dismiss. (Dkt. No. 69). Defendants Richard Hussey and Don Rivenburg ("Additional County Defendants") filed a motion to dismiss plaintiffs' complaint ("Additional County Defendants' Motion") with an accompanying memorandum of law on December 8, 2010. (Dkt. Nos.79, 80). Plaintiff Burroughs filed a response to the Additional County Defendants' Motion on December 29, 2010. (Dkt. No. 82).

[1]    Plaintiffs are currently in the custody of the New York State Department of Correctional Services ("DOCS"), with the exception of Lee Goergen, who has been released on parole and has not updated his address with the court. *See* http://nysdocslookup.docs.state.ny.us.

**DISCUSSION**

**I.** *Facts and Claims*

Plaintiffs divide the section of their complaint,[2] entitled "Facts," according to the claims they assert and the dates they associate with those claims.[3] Plaintiffs' first claim that from November 2006 to September 2007, they were "sexually harassed on a daily basis by defendant Beojekian, who would fondle his exposed penis during strip searches and at times touch [the plaintiffs]".[4] (Compl. p. 7).

[2]    Plaintiff Lee Goergen filed a motion to intervene (Dkt. No. 20) that was granted on April 6, 2010. (Dkt. No. 46). Plaintiff Goergen filed his complaint on April 6, 2010, which is in all respects identical to the complaint filed at Docket No. 1, with his name added as a plaintiff. For ease of reference, the court will only refer to the complaint filed at Docket No. 1.

[3]    Plaintiffs do not number the paragraphs or pages in their complaint, so the court will refer to material by citing to the page number assigned by the Case Management/Electronic Case Files (CM/ECF) system.

**Pine v. Seally, Not Reported in F.Supp.2d (2011)**
Case 9:17-cv-00126-GTS-TWD    Document 15    Filed 12/22/17    Page 35 of 54
2011 WL 856426

4    As described above in the facts, Beojekian is the only person involved in the alleged touching. The court assumes that plaintiff lists the other individuals in an attempt to establish supervisory liability based on their knowledge of Beojekian's history. *See Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (supervisory liability can be established if (1) that official directly participated in the infraction; (2) after learning of a violation through a report or appeal, he or she failed to remedy the wrong; (3) the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; or (4) he or she was grossly negligent in managing subordinates who caused the unlawful condition or event). Because the court is recommending dismissal on the merits of plaintiffs' claims, no analysis of personal involvement is necessary.

Plaintiffs' second claim is that from December 2006 to October 2007, defendants Snyder, Hussey, Schnur, and Rivenburg "racially harassed [the plaintiffs] on several occasions ... by wearing a white sheet with a hood, carrying a noose ... [and] threaten[ed] to hang us because we were niggers and nigger lovers." [5] (Compl. p. 8).

5    Although plaintiffs' cause of action is not clear, it appears from plaintiff Burroughs' response filed at Docket No. 55 that defendant Snyder was the person who actually made the threats, and plaintiff lists the other people in an attempt to establish supervisory liability. *See* Dkt. No. 55, ¶ 10; note 4, *supra,* and accompanying text.

Plaintiffs' third claim is that from October 2006 to August 2008, defendants Snyder, Skimmerhorn, Sutherland, McMannis, Jarvis, Voorheese, Rivernburg, Liese, and Warga assaulted plaintiffs "often," and spit in plaintiffs food or denied them food. (Compl. p. 8).

Plaintiffs' fourth claim is that from October 2006 to August 2008, defendants Seeley, Hussy, Schnur, Worth, and Spitz exposed plaintiffs to "unsanitary living conditions," where they were exposed to black mold, lead paint, and lead pipes. (Compl. p. 9). Plaintiffs were also exposed to scabies, "Mercer [6]," crabs, bed bugs, "T.B." [7], hepatitis, and other diseases "due to there being no medical tier." (Compl. p. 9).

6    The court assumes plaintiffs mean "MRSA," or methicillin-resistant staphylococcus aureus.

7    Tuberculosis.

**\*2** Plaintiffs fifth claim is that from December 2006 to August 2008, defendants Seeley, Hussey, Worth, Spitz, Schnur, Rivenburg, Liese, Voorheese, Warga, Cuttita, and Clark did nothing to address plaintiffs' complaints of their rights being violated. (Comp. p. 9).

Plaintiffs' sixth claim is that from October 2006 to August 2008, defendants Hussey, Seeley, Worth, Spitz, Schnur, Cuttita, and Clark refused plaintiffs' requests for legal reference material, the law library is outdated and there is no law clerk. [8] (Compl. p. 10).

8    It is unclear who denied legal materials to the plaintiffs.

Plaintiffs' seventh claim is that from November 2006 to August 2008, defendants Hussey, Schnur, Rivenburg, Spitz, Liese, Warga, Voorhese, Bennett, Seeley, and Worth lost and misplaced plaintiffs' mail. (Compl. p. 10).

Plaintiffs' eighth claim is that from October 2006 to August 2008, defendants Seeley, Spitz, Hussey, and Worth did not have a "trained person" handling plaintiffs' medications, causing plaintiffs to "often" be sick from receiving the wrong medication. (Compl. p. 11).

Plaintiffs' ninth claim is that from October 2006 to August 2008, defendants Hussey, Seeley, Schnur, Spitz, Liese, Voorhese, Warga, Rivenburg, and Bennett denied plaintiffs "legal calls" to their attorneys and denied plaintiffs postage for legal mail. [9] (Compl. p. 11).

9    Again, it is unclear who denied plaintiffs legal calls or postage for legal mail.

Plaintiffs' tenth claim is that from November 2006 to August 2008, defendant Warga refused to investigate any of the grievances plaintiffs filed. (Compl. p. 12).

Plaintiffs' eleventh claim is that from October 2006 to August 2008, defendants Hulbiki and Juliano "refused to properly treat [plaintiffs]" and refused to let plaintiffs "see an emergency room doctor until infections from [MRSA] spread, a hernia got worse, and blood began to leak out of the penis." (Compl. p. 12).

Plaintiffs twelfth claim is that from January 2008 to August 2008, defendants Seeley, Spitz, Worth, Liese, Warga, and Voorheese "locked in" plaintiffs, gave them no privileges, gave them only one hour of visitation per week, did not let plaintiffs make collect phone calls, refused to let plaintiffs purchase stamps or hygiene items, prevented plaintiffs from communicating with their attorneys about plea bargains, and prevented plaintiffs from communicating with their loved ones at all. (Compl. p. 13).

Plaintiffs' thirteenth claim is that from October 2006 to August 2008, defendants Hussey, Seeley, Worth, Schnur, and Spitz denied plaintiffs "Elder 'Rastafarian' or Eman [sic] 'Muslim' services ... special diets, the right to Ramadan," and Jewish inmates were not allowed to celebrate Passover and were not given kosher diets. (Compl. p. 13).

## II. *Relief Sought*

Plaintiffs seek injunctive relief, [10] in addition to significant compensatory and punitive damages. Presently before the court are the County Defendants' Motion, [11] the State Defendants' Motion, and the Additional County Defendants' Motion to dismiss the complaint for failure to state a claim pursuant to *Fed.R.Civ.P. 12(b)(6)*. This court recommends that the State Defendants' Motion be granted, the Additional County Defendants' Motion be granted, and the County Defendants' Motion be granted in part and denied in part for the reasons discussed below.

[10]   Plaintiffs seek injunctive relief for each of their claims, but because they are no longer being held at Greene County Jail, their claims for injunctive relief are moot. *See Thompson v. Choinski,* 525 F.3d 205, 209 (2d Cir.2008) (plaintiff's transfer moots his claims related to his conditions of confinement claims); *Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir.1976) (plaintiff's transfer moots claims for injunctive relief). sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* ___ U.S. ___, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is

and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

[11]   Plaintiffs have failed to serve defendants Snyder and Schnur, who therefore are not participating in the motions to dismiss. Failure to serve these defendants could be grounds for dismissal pursuant to *Fed.R.Civ.P. 4(m)*, but because the court is recommending dismissal of all plaintiffs' complaints for failure to state a claim except for one that does not involve defendant Snyder or Schnur, it also recommends dismissing the complaint as to the unserved defendants for failure to state a claim pursuant to *28 U.S.C.1915(e)(2)(B)(ii)*. This section provides that the court may dismiss an *in forma pauperis* action *sua sponte* at any time if the court determines that, *inter alia,* the action fails to state a claim on which relief can be granted.

## III. *Motion to Dismiss—Legal Standards*

**\*3**  To survive dismissal for failure to state a claim, the complaint must contain When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits, and any statements or documents incorporated in the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the motion to one for summary judgment).

## IV. *Conditions–of–Confinement*

Allegations of mistreatment of pretrial detainees in state custody are brought under the Due Process Clause of the Fourteenth Amendment. *See Caiozzo v. Korman,* 581 F.3d 63, 69 (2d Cir.2009). It has been held that

because a pretrial detainee has not been "convicted," the proper inquiry is whether the conditions of confinement amount to punishment under the Due Process Clause, not whether the "punishment" is cruel and unusual under the Eighth Amendment. *See Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (contrasting sentenced prisoners with pretrial detainees). However, the same standard applies to claims of deliberate indifference to a serious threat to the health or safety of a person in custody, regardless of whether they are brought under the Eighth Amendment, relating to convicted prisoners, or under the Fourteenth Amendment for pretrial detainees.[12] *See Caiozzo v. Korman,* 581 F.3d at 72.

[12]    Because the due process rights of pretrial detainees are "at least as great as the Eighth Amendment protections available to a convicted prisoner," and the same standard applies, cases cited that refer to the Eighth Amendment are thus applicable to the conditions of confinement claims alleged here. *Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983).

### A. Living Conditions1
Plaintiffs' fourth cause of action is based on alleged exposure to black mold, lead in pipes, and lead in paint while they were housed at Greene County Jail.

### 1. Legal Standards
To establish an Eighth Amendment or a Due Process claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway,* 37 F.3d at 66 (quoting *Wilson v. Seiter,* 501 U.S. at 298). In addition, "[b]ecause society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-

confinement' claim." *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.199) (citing *Hudson v. McMillan,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted).

**\*4** The objective prong can be satisfied by conditions of confinement, which, when combined, "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.*

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (citing *Wilson v. Seiter,* 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer,* 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway,* 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

Plaintiffs provide no specific facts other than "exposure," and list the names of jail personnel. In his response, plaintiff Burroughs states that the jail was under their "supervision" and they "did nothing to clean up" the mold or lead. (Dkt. No. 55, ¶ 21). Plaintiffs allege no injury or consequence resulting from their "exposure." This court does not find that plaintiffs allegations meet the objective prong required to establish a Constitutional violation, but even if the objective prong were met, plaintiffs have failed to show deliberate indifference on the part of the named defendants.

It is well-settled that personal involvement is required for assessments of damages in § 1983 actions. *See, e.g., Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (personal involvement is a prerequisite to the assessment of damages

in a section 1983 case); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Plaintiffs have not shown how any of the named defendants were involved in the alleged exposure to lead and mold, other than listing their names, associated with the alleged exposure. *See, e .g., Green v. Bauvi,* 792 F.Supp. 928, 941–942 (S.D.N.Y.1992) (inmate may recover damages for unconstitutional conditions of confinement only from persons who created or were responsible for those conditions).

Plaintiffs' third cause of action is based on alleged denials of food, and that defendants Snyder, Skimmerhorn, Sutherland, McMannis, Jarvis, Voorheese, Rivernburg, Liese, and Warga spit in plaintiffs' food. Plaintiffs fail to indicate with any specificity who did a particular action and when it occurred. Plaintiffs' allegations are conclusory, and not sufficient to cross over the line into plausibility. Conclusory allegations are insufficient to state constitutional claims. *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987). Complaints relying on civil rights statutes must contain some specific allegations of fact indicating a deprivation of rights, instead of a "litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (citing *inter alia Barr v. Abrams,* 810 F.2d at 363). Therefore, plaintiffs' third and fourth causes of action based on their conditions of confinement should be dismissed.

### B. Excessive Force

**\*5** Plaintiffs' third claim is based in part on allegations of being "assaulted on a regular basis" by defendants Snyder, Skimmerhorn, Sutherland, McMannis, Jarvis, Voorheese, Rivernburg, Liese, and Warga between October 2006 to August 2008.

#### 1. Legal Standards
Inmates enjoy Constitutional protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

#### 2. Application
Plaintiffs' general accusation of regular assault by a group of defendants, without more, is insufficient to state a plausible claim based on a use of excessive force. Plaintiffs allege no specific injuries incurred by any particular plaintiff and allege no specific details about any particular assault by any named defendant. Plaintiffs' third claim based on a use of excessive force should be dismissed without prejudice.

### C. Medical Indifference

**Pine v. Seally, Not Reported in F.Supp.2d (2011)**
Case 9:17-cv-00126-GTS-TWD   Document 15   Filed 12/22/17   Page 39 of 54
2011 WL 856426

**\*6** Plaintiffs claim that Doctor Hulbiki and Nurse Juliano were deliberately indifferent to their medical needs because they did not treat them appropriately. Deliberate indifference to serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The standards applied to assess the adequacy of medical care provided to pretrial detainees under the Due Process Clause are the same as those applied to convicted prisoners under the Eighth Amendment. *Id.* at 69, 70–72; *Mayo v. County of Albany,* 357 Fed. Appx. 339, 341(2d Cir.2009).

### 1. Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, plaintiffs must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2 d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 Fed. Appx. 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency

that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 Fed. Appx. at 236 (citing *Chance v. Armstrong,* 143 F.3d at 702 and *Smith v. Carpenter,* 316 F.3d at 187 (actual medical consequences are highly relevant)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837.

**\*7** A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (1992) (table).

### 2. Application

Plaintiffs' fourth claim is based in part on alleged exposure to various parasites and diseases. Plaintiffs' eighth claim is based on defendants Seeley, Spitz, Hussey, and Worth, supervisors at Greene County Jail, failure to properly supervise correctional officers dispensing medication, causing plaintiffs to receive incorrect medication and become sick. (Compl. p. 12, Dkt. No. 55, ¶ 65–66). Plaintiffs' eleventh claim is based on alleged MRSA infections, a reference to "blood began to leak out of the penis" and plaintiff Burroughs' hernia. (Compl. p. 12). As to the exposure to various parasites and diseases, plaintiffs

Pine v. Seally, Not Reported in F.Supp.2d (2011)
Case 9:17-cv-00126-GTS-TWD    Document 15    Filed 12/22/17    Page 40 of 54
2011 WL 856426

allege no specific injury, not indicating who, if anyone, had MRSA or blood leaking out of his penis and the requisite deliberate indifference to that medical need.

Plaintiff Burroughs alleges that after he tested positive for tuberculosis, Doctor Hulbiki and Nurse Juliano failed to give him medicine. (Burroughs's Response ¶ 33–34). Plaintiff Burroughs attaches a copy of the form indicating his positive test for tuberculosis. (Burroughs's Response Exhibit B). However, this only establishes that he was seen by medical professionals, and he tested positive for tuberculosis. Plaintiff Burroughs does not indicate if he suffered from any symptoms of tuberculosis. He only states that he was housed with other inmates after receiving his diagnosis. [13] Because plaintiff Burroughs fails to allege any injury resulting from his diagnosis, he has failed to establish anything other than a disagreement with how medical professionals chose to treat him, which, as explained above, is insufficient to state a claim for deliberate indifference to a serious medical need.

[13]    Plaintiff Burroughs appears to be attempting to assert the rights of other inmates. However, a litigant has no standing to assert the constitutional rights of others. *Carlen v. Department of Health Services of Suffolk,* 912 F.Supp. 35, 42

Plaintiff Burroughs' hernia is a different matter. Burroughs alleges that he met with Dr. Hulbiki on several occasions for treatment of his hernia, which was the "size of a softball." [14] (Burroughs's Response ¶ 74). Burroughs alleges that he received no treatment for the attendant pain and it was only after a court order that he was able to get surgery for his hernia at Columbia Hospital in Hudson, New York. (Burroughs's Response ¶¶ 76–77). After his hernia surgery, plaintiff Burroughs alleges that Dr. Hulbiki and Nurse Juliano failed to give him his prescribed pain medication, and the correctional officers who dispense medication failed to give him his prescribed pain medication. (Burroughs's Response ¶¶ 67, 69–70). He also alleges that the correctional officers "would hear me crying from the pain after my surgery and I would hear them laughing at me." (Burroughs's Response ¶ 68). However, plaintiff Burroughs does not specify which correctional officers were aware of his serious pain and ignored it. [15]

[14]    Plaintiff Burroughs clarifies the details of his claim in his response. As noted by the court in *Benitez*

*v. Ham,* "the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint." No. 9:04–CV–1159, 2009 WL 3486379, at *8 (N.D.N.Y. October 21, 2009) (citing, *inter alia, Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986)).

[15]    Plaintiff Burroughs is not attempting to sue the correctional officers who allegedly heard him.

**\*8** Plaintiff Burroughs has sufficiently stated a claim for deliberate indifference to a serious medical need as to Doctor Hulbiki and Nurse Juliano. Defendants' motion to dismiss plaintiff Burroughs' Eighth Amendment claim of deliberate indifference to his serious medical need based on his hernia and extreme pain from hernia surgery should be denied.

### D. Harassment

Plaintiffs' first cause of action is based on the alleged inappropriate touching that occurred between November 2006 to September 2007.

While allegations of sexual abuse may, in some circumstances, violate the Eighth Amendment, isolated incidents of harassment, involving verbal harassment and touching are not severe enough to be "objectively, sufficiently serious." *Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997) (quoting *Whitely v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). In order to violate the Eighth Amendment, the "punishment" must be "objectively, sufficiently serious," and the official must have had a "sufficiently culpable state of mind." *Id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The plaintiff in *Boddie* was also claiming an Eighth Amendment violation based upon allegations of sexual abuse. *Id.* The court held that the "isolated episodes of harassment and touching alleged by Boddie are despicable and, if true, they may potentially be the basis of state tort actions. But they do not involve a harm of federal constitutional proportions ...." *Id.*

In this case, plaintiffs allege that defendant Beojekian conducted strip frisks that rose to the level of sexual harassment. Pursuant to *Boddie,* allegations such as those made by plaintiffs do not rise to the level of constitutional

2011 WL 856426

violations regardless of the impropriety of the action.[16] *Id.* Thus, plaintiffs' claim based on sexual harassment should be dismissed.

[16]  The court notes that numerous courts have held that allegations of sexual abuse during frisk searches do not implicate the Eighth Amendment. *See Morrison v. Cortright,* 397 F.Supp.2d 424 (W.D.N.Y.2005) (allegation that correctional officer shone light up inmate's anus, ran his middle finger between inmate's buttocks, causing inmate to urinate on himself, and rubbed his penis against inmate's buttocks during strip frisk failed to implicate the Eighth Amendment); *Davis v. Castleberry,* 364 F.Supp.2d 319, 321 (W.D.N.Y.2005) (allegation that correction officer grabbed inmate's penis during pat frisk insufficient); *Montero v. Crusie,* 153 F.Supp.2d 368 (S.D.N.Y.2001) (allegation that correctional officer, on several occasions, squeezed inmate's genitalia during pat frisks did not implicate the Eighth Amendment, especially when inmate did not allege physical injury); *Williams v. Keane,* No. 95 Civ. 379, 1997 U.S. Dist. LEXIS 12665, 1997 WL 527677, at * 11 (S.D.N.Y. Aug.25, 1997) (allegation that correctional officer put his hand down inmate's pants and fondled inmate's genitals during frisk search failed to implicate the Eighth Amendment).

Plaintiffs' second cause of action is based on alleged racial slurs and threats made between October 2006 and August 2008. However, verbal harassment, "unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and, therefore, is not actionable under ... § 1983." *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (a guard calling a plaintiff names did not establish any "appreciable injury" and dismissal of the claim was proper). Plaintiffs in this case did not assert, nor does the record support, any allegations of physical injury related to the verbal harassment, however inappropriate it might have been. Even accepting plaintiffs' allegations as true, this court finds that plaintiffs have failed to state a claim, and their second cause of action based on verbal harassment should be dismissed.

**V. *Grievances and Investigations***
Plaintiffs' fifth and tenth causes of action pertain to grievances and defendants' alleged failure to respond

or investigate them. The law is well-settled that inmates do not have a constitutional right to grievance procedures. *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Davis v. Buffardi,* No. 0:01–CV–0285, 2005 U.S. Dist. LEXIS 45487, 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) (Magnuson, J.) ("[p]articipation in an inmate grievance process is not a constitutionally protected right") (citations omitted). Furthermore, a violation of the inmate grievance procedures does not give rise to a claim under section 1983. *Cancel v. Goord,* No. 00 CIV.2042, 2001 U.S. Dist. LEXIS 3440, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001).

 **\*9** To the extent that plaintiffs attempt to assert a separate constitutional claim of "failure to investigate," the law is also clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials. *Bernstein v. New York,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) (collecting cases). In order for a constitutional violation to have occurred, the investigation *itself* must have resulted in a deprivation of a constitutional right. *Faison v. Hash,* 03–CV–6475P, 2004 U.S. Dist. LEXIS 29151 at *6, 2004 WL 944523 (W.D.N.Y. Apr.23, 2004) (citing *Malloy v. City of New York,* 1996 U.S. Dist. LEXIS 16417 at *6, 1996 WL 648927 (S.D.N.Y. Nov.7, 1996) (holding that warden's alleged failure to investigate assault by correctional officer did not give rise to constitutional violation, where plaintiff failed to show that warden could have anticipated or had other direct involvement in the assault; *Gomez v. Whitney,* 757 F.2d 1005 (9th Cir.1985) (a claim against a police department for failure to investigate is insufficient to state a civil rights claim without another recognized constitutional right being involved).

First, contrary to plaintiffs' allegations that defendants failed to investigate, Beojekian's Arrest Report,[17] submitted as Exhibit A to plaintiff Burroughs's own opposition papers (Dkt. No. 55), indicates that an investigation was conducted and mentions that Aaron Beojekian "had numerous allegations regarding sexual misconduct with the inmates." (Pls' Opp. to Mot. to Dismiss, Ex. C). In any event, plaintiffs had no constitutional right to any investigation of their grievances. Accordingly, plaintiffs' claims based on the alleged failure to investigate their grievances may be dismissed for failure to state a constitutional claim.

17    Beojekian was arrested on January 10, 2008, and the report indicates that the reasons for the arrest were the allegations of sexual misconduct by Beojekian involving inmates at the Greene County Jail. (E.D.N.Y.1996) (citing *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

## VI. *Mail Tampering and Access to Courts*

Plaintiffs allege that their access to the courts was hindered due to the alleged inadequacy of the law library at the Greene County Jail. Plaintiffs also claim that they were not permitted to contact their attorneys as much as they would have liked.

In order to establish a claim that a prisoner's right of access to the courts has been violated, actual injury must be shown. *See Lewis v. Casey,* 518 U.S. 343, 351–52, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Inmates' right of access to the courts is not "an abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis,* 518 U.S. at 351–54. To establish a violation, "the inmate ... must ... demonstrate that the alleged shortcomings ... hindered his efforts to pursue a legal claim." *Lewis,* 518 U.S. at 351. The same standard applies when inmates claim that legal mail has been obstructed. *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Plaintiffs must allege that the defendants' actions hindered their "efforts to pursue a legal claim." *Id.* (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997).

**\*10** Prior to the Supreme Court's decision in *Lewis,* the Second Circuit had held that "an isolated instance" of interference with an inmate's legal mail delivery was insufficient to state a First Amendment claim, either with respect to the mail itself or with respect to access to courts, where "the infraction was not in accordance with official policy or practice and where no showing had been made that the inmate's right to access to courts was chilled...." *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986) (citation omitted). *Lewis* also suggests that the actual harm must be direct or collateral attacks on the inmate's conviction, or to a challenge to the conditions of confinement. 518 U.S. at 355. "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d at

352 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995)).

Plaintiffs' right of access to the courts was not abridged in any way by defendants' actions, even assuming that plaintiffs' allegations are true. Plaintiffs' allegations are conclusory statements that the law library is "inadequate," and "outdated." (Compl. p. 11). If, as their allegations suggest, plaintiffs had been appointed attorneys, no access to any law library was required. *See Bourden v. Loughgren,* 386 F.3d 88, 93 (2d Cir.2004) ("the appointment of counsel can be a valid means of satisfying a prisoner's right of access to the courts").

Plaintiffs only allegations of injury is that they were "unable to file motions on our behalf that could have been fruitful to our criminal cases." (Compl. p. 11). These allegations are insufficient to state a plausible claim for denial of access to the courts. Accordingly, plaintiffs' sixth, seventh, ninth, and twelfth claims related to the alleged deficiencies in the quality of the law library, the lack of access to legal materials, and limited access to attorneys should be dismissed.

## VII. *First Amendment*

Plaintiffs' thirteenth claim is based on defendants' alleged violation of the Free Exercise Clause of the First Amendment. The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04–CV–57, 2007 WL 3046703, at \*4, 2007 U.S. Dist. LEXIS 77239 (N.D.N.Y. Oct.17, 2007). The Free Exercise Clause extends "beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet...." *Id.* The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise

rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

 **\*11** Plaintiffs do not specify who among them, if any, is Rastafarian, Muslim, or Jewish. They do not specify who denied them meals appropriate to their specific religious beliefs and how their specific religious beliefs were abridged, other than conclusory allegations of denial of Rastafarian or Muslim services, special diets, or celebration of Ramadan or Passover. The defendants that plaintiffs associate with these allegations are Sheriff Hussey, Sheriff Seeley, Undersheriff Worth, Superintendent Spitz, and Lieutenant Schnur. Each defendant's duties is described as "manages the jail's daily operations and executes the jail's policies." (*See Civil Cover Sheet,* Dkt. No. 1–1 at ¶¶ 1–4, 14). Plaintiffs appear to be attempting to establish personal involvement based on these defendants' supervisory roles at Greene County Jail. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (holding that a position in a hierarchical command structure, without more, is insufficient to establish personal involvement). Plaintiffs' allegations are insufficient to establish personal involvement on the part of the named defendants, and do not cross the line into plausibility to render them adequate enough to state a claim. Plaintiffs' thirteenth claim should be dismissed.

## VII. *Qualified Immunity*
Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). However, even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990).

In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), modified by *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 811, 172 L.Ed.2d 565 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as

mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This court need not address qualified immunity with respect to those of plaintiff's claims which do not state actionable violations of his constitutional rights.

As to plaintiff's deliberate indifference claims against defendants Hulbiki and Juliano, it was clearly established, as of the time of the alleged incidents in 2007, that plaintiffs had a Constitutional right to be free from deliberate indifference to their medical needs. *See, e.g., Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Smith v. Carpenter,* 316 F.3d 178 (2d Cir.2003). Thus, accepting plaintiff's allegations as true, qualified immunity cannot protect defendants Hulbiki and Juliano at this time, because a reasonable person in their position would or should have known that deliberate indifference to medical needs was a constitutional violation.

 **\*12 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the State Defendants' Motion (Dkt. No. 22) be **GRANTED,** and plaintiffs' claims as to defendants Robert Cuttita and Deborah Clark be **DISMISSED IN THEIR ENTIRETY,** and it is further

**RECOMMENDED,** that the Additional County Defendants' Motion (Dkt. No. 79) be **GRANTED,** and plaintiffs' claims as to defendants Peter Bennett, John Jarvis, Ken Liese, Brian McMannis, Gregory Seeley, Donnie Skimmerhorn, Michael Spitz, Mike Sutherland, Edward Vorheese, Ed Warga, and Steven Worth be **DISMISSED IN THEIR ENTIRETY,** and it is further

**RECOMMENDED,** that county defendants' motion to dismiss (Dkt. No. 49) be **GRANTED IN PART AND DENIED IN PART** and all plaintiffs' claims be **DISMISSED IN THEIR ENTIRETY** as to all defendants except for plaintiff Burroughs' claim based on deliberate indifference to his serious medical need as to defendants Hulbiki and Juliano.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN**

2011 WL 856426

**DAYS WILL PRECLUDE APPELLATE REVIEW.**
*Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing
*Small v. Secretary of Health and Human Services,* 892 F.2d
15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a),
6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 856426

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 4985683
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Ronald A. SCACCIA, Plaintiff,

v.

COUNTY OF ONONDAGA, NEW YORK; Timothy
H. Cowin, County Comm'r of Corr.; Kevin E.
Walsh, County Sheriff; and Mark Johnston, M.D.,
Med. Dir. of Corr. Health Servs., Defendants.

No. 5:07-CV-0207 (GTS/GJD).
|
Dec. 15, 2009.

**Attorneys and Law Firms**

Scaccia Law Firm, Dante M. Scaccia, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Gordon J. Cuffy, Onondaga County Attorney, Carol L. Rhinehart, Esq., Deputy County Attorney, of Counsel, Syracuse, NY, for Defendant.

*MEMORANDUM DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this prisoner civil rights action, filed by Ronald Scaccia ("Plaintiff") against the County of Onondaga, County Commissioner of Corrections Timothy Cowin, County Sheriff Kevin Walsh, and Medical Director of Correctional Health Services Mark Johnston (collectively "Defendants") pursuant to 42 U.S.C. § 1983, is Defendants' motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 9.) For the reasons set forth below, Defendants' motion is granted in part and denied in part.

**I. GENERAL BACKGROUND**

**A. Plaintiff's Claims**

Generally, liberally construed, Plaintiff's Complaint, filed on February 26, 2007, alleges that, at the Onondaga County Correctional Facility (the "Correctional Facility"), and the Onondaga County Justice Center (the "Justice Center") in Syracuse, New York, the individual Defendants violated Plaintiff's rights under the Eighth Amendment by (1) personally being deliberately indifferent to his serious medical needs (specifically, his hernia condition), and/or (2) failing to adequately train and supervise County personnel who were deliberately indifferent to his serious medical needs. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Plaintiff's Complaint further alleges that the County violated Plaintiff's rights under the Eighth Amendment because of a municipal policy or custom of impermissibly shifting responsibility for involuntarily incurred medical expenses from the County to its inmates, including Plaintiff. (*Id.*) Plaintiff's Complaint alleges that, as a result of these constitutional violations, he suffered significant and unnecessary pain due to a worsened hernia condition. (*Id.*) As relief for his injuries, Plaintiff requests, *inter alia*, monetary and punitive damages. (*Id.*)

More specifically, Plaintiff alleges, while some members of the Correctional Facility and/or Justice Center staff appear to have responded unobjectionably to his hernia condition between March 12, 2003, and February 25, 2004, other members of the Correctional Facility and/or Justice Center staff were either negligent or reckless with regard to his treatment for that hernia condition during that time period. (*Id.*)

The staff members who appear to have responded unobjectionably to Plaintiff's hernia condition included the following: (1) the unidentified staff member who excused Plaintiff from work on his first day of work in the Correctional Facility's laundry in July 2003, due to his hernia condition; (2) the unidentified nurse who saw Plaintiff for his hernia condition on September 27, 2003, and placed him on a list to be seen by a doctor; (3) the unidentified nurse who saw him on December 7, 2003, for his hernia condition; (4) Dr. Roy A. Smith, M.D., who [a] saw Plaintiff for his hernia condition on December 10, 2003, and January 27, 2004, twice referring him to a surgical clinic outside the Correctional Facility, [b] saw him for his hernia condition on February 16, 2004, sending him to the emergency room of an outside hospital, and [c] saw him for his hernia condition on February 17, 2004, consulting with County Health Commissioner

Dr. Novick, prescribing Plaintiff medication, scheduling his immediate surgery, and later transferring him to the Justice Center pending that surgery; (5) the unidentified nurse who saw Plaintiff for his hernia condition on January 1, 2004, and encouraged him to write Defendant Johnston regarding his hernia; (6) the unidentified nurse who saw him for his hernia condition on January 12, 2004, and placed him on a list to be seen by a doctor; (7) the unidentified staff members of the Correctional Facility who ushered him directly to the medical unit on February 16, 2004, when he collapsed at work due to his hernia condition; (8) the unidentified members of the Correctional Facility medical staff who contacted a doctor by telephone regarding Plaintiff's hernia condition on February 16, 2004, and then sent Plaintiff to his housing unit with an instruction to stay in bed with his feet elevated; (9) the unidentified nurse who saw him for his hernia condition in his cell on February 16, 2004, and gave him a very large dose of Tylenol; (10) the unidentified nurse who saw him for his hernia condition on February 17, 2004, and told him to let the medical staff know immediately if he experienced certain symptoms; (11) the unidentified members of the Correctional Facility medical staff who responded to his sick call request on February 18, 2004; and (12) the unidentified staff members in the Justice Center who provided him with the use of a wheelchair at the Justice Center. (Id.)

*2 The staff members who did not respond appropriately to Plaintiff's hernia condition included the following: (1) the unidentified nurse who conducted Plaintiff's initial screening on March 12, 2003, and cleared him for work assignments without limitations, despite his noted left inguinal hernia, left arm and/or shoulder injury, and restricted lifting ability; (2) the unidentified doctor who saw Plaintiff in the Medical Unit on October 15, 2003, but did not address his hernia problem; (3) the unidentified doctor who saw Plaintiff in the Medical Unit on November 15, 2003, but did not check his groin area for the hernia problem; (4) Defendant Johnston, who twice (on December 10, 2003, and January 28, 2004) prevented Plaintiff from attending the surgical clinic outside the Correctional Facility due to his approaching release date of February 25, 2004, thus causing Plaintiff to experience unnecessary pain; (5) the unidentified members of the Correctional Facility medical staff who did not respond to Plaintiff's requests for medical care between January 31, 2004, and February 16, 2004; (6) the "transporting officers" who, before Plaintiff was seen by the staff of the

outside hospital on February 16, 2004, and February 20, 2004, required him to sign hospital paperwork accepting financial responsibility for the services required, and who (after learning that an operating room would not be available until the next day) checked with unidentified medical staff at the Correctional Facility and returned Plaintiff to the Correctional Facility; (7) a "Deputy Messina," as well as other unidentified deputies and nurses in the Justice Center, who ignored Plaintiff's painful hernia condition in the Justice Center on February 19, 2004; and (8) Dr. John Michaels, M.D., of the Justice Center who told Plaintiff on February 23, 2004, that the treatment of his back pain would have to wait until after his release date. (Id.)

Familiarity with the other factual allegations supporting Plaintiff's claims is assumed in this Decision and Order, which is intended primarily for review by the parties. (Id.)

### B. Defendants' Motion to Dismiss

Generally, in support of their motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), Defendants argue as follows: (1) based on Plaintiff's own factual allegations, his action is barred by the three-year statute of limitations governing claims arising under 42 U.S.C. § 1983 (Dkt. No. 9, Part 3, at 5-6 [Defs.' Memo. of Law] ); (2) Plaintiff has failed to allege facts plausibly suggesting that Defendants (or their subordinates) were deliberately indifferent to Plaintiff's non-urgent hernia condition (id. at 8-9); (3) Plaintiff's claim against the County must be dismissed because he has failed to allege facts plausibly suggesting "any tangible connection between a municipal policy and his alleged injury or any existence of a violative policy" (id. at 6-9); (4) Plaintiff's claims against Defendants Cowin, Walsh and Johnston in their official capacities must be dismissed as the same as Plaintiff's claim against the County (id. at 7); (5) based on Plaintiff's factual allegations, Defendants are entitled to the affirmative defense of qualified immunity (id. at 10-11); and (6) Plaintiff has not alleged facts plausibly suggesting that any of the individual Defendants-each of whom was a supervisor-was personally involved in the Eighth Amendment violation alleged (id. at 10-11).

*3 In Plaintiff's response to Defendants' motion to dismiss, he argues as follows: (1) his action was timely commenced because (a) for security reasons, employees of the County withheld from Plaintiff information that would have led him to know of the harm giving rise

to his claims, (b) the continuing violation doctrine renders timely his claims arising from acts occurring outside the limitations period, and (c) the equitable tolling doctrine excuses the one-day delay under the circumstances because the final day of the limitations period fell on a Sunday (Dkt. No. 13, Part 2, at 8-9 [Plf.'s Response Memo. of Law] ); (2) his Complaint states a claim under the Eighth Amendment by alleging facts plausibly suggesting that Defendants (or their subordinates) consciously withheld necessary medical care for Plaintiff's urgent and painful hernia condition in order to save money (*id.* at 6-7); (3) his Complaint states a viable claim against the County by alleging facts plausibly suggesting a causal connection between a municipal custom or policy and Plaintiff's injuries (*id.* at 9-10); (4) Defendants have not established an entitlement to qualified immunity as a matter of law at this early stage in the proceeding (*id.* at 10-11); and (5) Plaintiff has alleged facts plausibly suggesting that Defendant Johnston (through his cancellation of Plaintiff's planned treatment on two occasions) and Defendants Cowin and Walsh (through their failure to train their subordinates) were personally involved in the Eighth Amendment violation alleged (*id.* at 7, 10). Even construed with the utmost of special liberality, Plaintiff's Response Memorandum of Law does not address Defendants' argument that Plaintiff's claims against Defendants Cowin, Walsh and Johnston in their official capacities must be dismissed as the same as Plaintiff's claim against the County. (*See* Dkt. No. 13, Part 2 [Plf.'s Response Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

It has long been understood that a dismissal for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6), may be based on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 211, nn.15-16 (N.D.N.Y.2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review) [citations omitted].

With regard to the first ground, Fed.R.Civ.P. 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires

that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n.17 [citations omitted]. The main purpose of this rule is to "facilitate a proper decision on the merits." *Id.* at 212, n.18 [citations omitted]. [1]

[1] *See also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ( "Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F .2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

**\*4** The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. *Id.* at 212, n.20 [citations omitted]. However, even this liberal notice pleading standard "has its limits." *Id.* at 212, n.21 [citations omitted]. As a result, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet this liberal notice pleading standard. *Id.* at 213, n.22 [citations omitted]; *see also Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968-69. Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation [s]." *Id .* at 1965 [citations

omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* [citations omitted]. [2]

[2]     *See also Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ( "[The Supreme Court] is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ).

As have other Circuits, the Second Circuit has recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, including claims brought by *pro se* litigants (although the plausibility of those claims is to be assessed generously, in light of the special solicitude normally afforded *pro se* litigants). [3] It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific* facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007) [citation omitted; emphasis added]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n.3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. [4]

[3]     *See, e.g., Jacobs v. Mostow,* 271 F. App'x 85, 87 (2d Cir. March 27, 2008) (in *pro se* action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Rule 32.1[c][1] of the Local Rules of the Second Circuit); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that

borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

[4]     For example, in *Erickson,* the Supreme Court held that, because the plaintiff-prisoner had alleged that, during the relevant time period, he suffered from hepatis C, he had alleged facts plausibly suggesting that he possessed a sufficiently serious medical need for purposes of an Eighth Amendment claim of inadequate medical care. *Erickson,* 127 S.Ct. at 2199-2200. Expressed differently, the Court held that such a plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication (a requirement that had been imposed by the district court). This point of law is hardly a novel one, which is presumably why the *Erickson* decision was relatively brief. Prior to the Supreme Court's decision, numerous decisions, from district courts within the Second Circuit alone, had found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e.g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept. 9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n.11 (S.D.N.Y. Jan. 23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000). The important thing is that, in *Erickson,* even the *pro se* plaintiff was required to allege some sort of fact.

**\*5** As the Supreme Court recently explained, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " *Ashcroft,* 129 S.Ct. at 1949 (citing Fed. Rule Civ. Proc. 8[a][2] ). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft,* 129 S.Ct. at 1949. Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal citations and alterations omitted).

2009 WL 4985683

Finally, in reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor. This standard is applied with even greater force where the plaintiff alleges civil rights violations. However, while the special leniency afforded to civil rights litigants somewhat loosens the procedural rules governing the form of pleadings, it does not completely relieve such a civil rights litigant of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. Rather, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even civil rights litigants must follow.

**B. Legal Standards Governing Plaintiff's Claims**

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standards governing Plaintiff's claims in this action, the Court will not recite, in their entirety, those legal standards in this Decision and Order, which is intended primarily for review by the parties. (*See* Dkt. No. 9, Part 3 [Defs.' Memo. of Law]; Dkt. No. 13, Part 2 [Plf.'s Response Memo. of Law].)

**III. ANALYSIS**

**A. Whether the Action was Timely Commenced**

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's claim because it was not timely commenced. Under the circumstances, the Court rejects Defendants' argument.

"The statute of limitations for claims brought under Section 1983 is governed by state law, and in this case is the three-year period for personal injury actions under New York State law." *Shomo v. City of New York,* 579 F.3d 176, 181 (2d Cir.2009) (citation omitted). "A Section 1983 claim ordinarily accrues when the plaintiff knows or has reason to know of the harm." *Shomo,* 579 F.3d at 181 (citation omitted).

Here, Plaintiff alleges facts plausibly suggesting that he did not know that Defendants were going to breach their (asserted) duty to give him hernia surgery while incarcerated until he was discharged from prison on February 25, 2004, without having had that surgery. (*See, e.g.,* Dkt. No. 1, ¶ 83.) Among other things, Plaintiff

alleges that (1) referrals for his surgery were repeatedly made and cancelled, and (2) various individuals kept from Plaintiff information about the date and location of his (offsite) surgery for security reasons. (*Id.* at 27, 28, 37, 40, 53, 76, 80.) As a result, the Court finds that the date on which the three-year limitations period starting running was February 25, 2004 (the date on which he realized that the Correctional Facility was not going to provide him with the required medical treatment). [5]

[5] The Court notes that, in reaching this conclusion, it need not, and does not, rely on the continuing violation doctrine, which requires the existence of an ongoing *policy* (and arguably a policy of *discrimination*). *Shomo,* 579 F.3d at 181 ("To trigger the continuing violation doctrine when challenging discrimination, the plaintiff must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy.") (citation omitted).

**\*6** Plaintiff filed his Complaint in this action on Monday, February 26, 2007-three years and one day after February 25, 2004. Case law exists from within this Circuit holding that, where the last day of the limitations period falls on a Sunday, an action filed on the following day is timely. [6] Applying such a rule appears particularly appropriate in this case, in which-although it might be argued that an attorney registered on the Court's Electronic Case Filing System could have filed a complaint on at any time on Sunday, February 25, 2007-Plaintiff's counsel was exempted from having to comply with that System, under Section 2.1 of General Order # 22, as an attorney admitted to practice in this Court more than fifty years ago. As a result, there was no way he could have filed this action on either Saturday, February 24, 2007, or Sunday, February 25, 2007.

[6] *See Daisley v. FedEx Ground Package System, Inc.,* 08-CV-4063, 2008 WL 5083009, at *3 (E.D.N.Y. Dec. 1, 2008)* (where the statute of limitations for breach of contract claims in New York is six years, and the cause of action accrues at the time of breach, a complaint that was filed on September 15, 2008, six years and one day after any claim arising out of conduct on September 14, 2002 may have accrued, was timely because the last day of the limitations period fell on a Sunday, and "when the last day of the limitations period falls on a Sunday-as it did in

Scaccia v. County of Onondaga, New York, Not Reported in F.Supp.2d (2009)

2009 WL 4985683

this case-that day is excluded and the period runs until Monday").

For all these reasons, the Court finds that Plaintiff's action was timely commenced. As a result, the Court denies Defendants' motion to dismiss to the extent that it is premised on this ground.

### B. Whether the Complaint States a Claim for a Violation of the Eighth Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's Eighth Amendment claim because the Complaint fails to state a claim upon which relief may be granted. Based on the factual allegations contained in Plaintiff's Complaint, the Court rejects Defendants' argument.

To state a claim under 42 U.S.C. § 1983 for deprivation of medical treatment in violation of the Eighth Amendment, a plaintiff must show that defendants acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "To establish deliberate indifference, the plaintiff must prove that the prison official knew of and disregarded the plaintiff's serious medical needs." *Harrison v. Barkley,* 219 F .3d 132, 137 (2d Cir.2000) (citations omitted). "Deliberate indifference will exist when an official knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Barkley,* 219 F.3d at 137-38 (citations omitted).

As explained above in Part I.A. of this Decision and Order, generally, in his Complaint, Plaintiff alleges, while some members of the Correctional Facility staff and/or Justice Center staff appear to have responded unobjectionably to his hernia condition (e.g., Dr. Smith), other members of the Correctional Facility staff and/ or Justice Center staff were either negligent or reckless with regard to promptly treating his hernia condition (e.g., Defendant Johnston), causing him to experience significant and unnecessary pain. For example, among other things, Plaintiff alleges that, over time, he experienced the following symptoms, in chronological order: an "aggravated" hernia, a "lump on his lower left back," increased pain, an enlarged hernia that had entered his scrotum, "unbearable" pain, "excruciating" pain that led to a physical collapse, an incarcerated hernia, constipation, nausea, headache, vomiting, confinement to a hospital bed, physical immobility without the use of a

wheelchair, and the inability to eat. (*See, e.g.,* Dkt. No. 1, ¶¶ 21, 22, 25, 30, 36, 41, 44, 45, 48, 57, 59, 60, 63, 76-82.)

**\*7** Based on these factual allegations, the Court concludes that Plaintiff has sufficiently alleged facts plausibly suggesting both that he had a serious medical need, and that certain staff members at the Correctional Facility and Justice Center-including Defendant Johnston-knew of and disregarded Plaintiff's serious medical need. The Court rejects Defendants' argument that, because Plaintiff received at least some medical care, and because Plaintiff had no right to the medical treatment of his choice, he was not denied medical care.[7] Similarly, the Court rejects Defendants' argument that the only injury Plaintiff incurred was an expense to address a nonurgent matter.[8]

[7]    Defendants' argument overlooks the fact that the Complaint alleges that, as a result of repeatedly delaying Plaintiff's medical care and surgery, various staff members (including Defendant Johnston) worsened Plaintiff's condition to the point where he suffered unnecessary pain and where he could have suffered a further significant injury (including rupturing of the hernia). It must be remembered that "a serious medical need arises where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at \* 10 (S.D.N.Y. Jan. 23, 2004) (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 [2d Cir.1998] ) (other citation omitted).

[8]    Setting aside any financial injury that Plaintiff did or did not suffer, Plaintiff has alleged facts plausibly suggesting that he unnecessarily suffered extreme pain for a period of weeks due to his delayed hernia surgery.

For all of these reasons, the Court denies Defendants' motion to dismiss to the extent that it is premised on this ground. Whether Plaintiff has alleged facts plausibly suggesting that any Defendant other than Defendant Johnston is liable for that Eighth Amendment violation is another issue, which shall be addressed below.

### C. Whether the Complaint Alleges a Causal Connection Between Plaintiff's Injuries and a Policy or Custom of the County

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's claim against the County because the Complaint fails to allege facts plausibly suggesting a causal connection between Plaintiff's injuries and a policy or custom of the Correctional Facility and/or Justice Center. Based on the factual allegations of Plaintiff's Complaint, the Court accepts Defendants' argument.

"Although municipalities are considered 'persons' for purposes of 42 U.S.C. § 1983, a local government such as [a] County ... may not be held liable under § 1983 unless the challenged action was performed pursuant to a municipal policy or custom." *Powers v. Gipson,* 04-CV-6338, 2004 WL 2123490, at *2 (W.D.N.Y. Sept. 14, 2004) (citing *Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 694 [1978] ). [9] This is because "[m]unicipalities are not subject to § 1983 liability solely on the basis of a *respondeat superior*" theory." *Powers,* 2004 WL 2123490, at *2 (citations omitted). [10] As a result, to establish a Section 1983 claim against a municipality, a plaintiff must prove two things: (1) "the plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries"; and (2) "the plaintiff must [second] establish a casual connection-an affirmative link-between the policy and deprivation of his constitutional rights." *Id.*

[9]     *Accord, Harris v. Howard,* 08-CV-4837, 2009 WL 3682537, at *2 (S.D.N.Y. Oct. 30, 2009) ("In order to plead a claim under 42 U.S.C. § 1983 against a municipality, plaintiff must allege that a municipal policy or custom caused the deprivation of his constitutional rights.").

[10]    *Accord, Howard,* 2009 WL 3682537, at *2 ("A municipality may not be held liable under Section 1983 on the basis of *respondeat superior.*" ).

Here, although Plaintiff alleges conclusorily that the County required other inmates to execute agreements to assume financial responsibility for payment of their medical care at medical facilities outside the Correctional Center and/or Justice Center (Dkt. No. 1, ¶ 86), Plaintiff fails to allege facts plausibly suggesting that the County in fact imposed that requirement on inmates other than Plaintiff (*see generally* Dkt. No. 1). Moreover, it is questionable whether Plaintiff has even alleged facts plausibly suggesting that the County imposed such a "requirement" on him; rather, it appears that unidentified

transporting officers (none of whom is alleged to have been acting at the behest of, or in concert with, Defendant Johnston) permitted Plaintiff to disclaim such financial responsibility for his care and continue to receive care at an outside medical facility (contingent on the availability of its operating room). (Dkt. No. 1, ¶¶ 50, 51, 70, 71.)

**\*8** Similarly, although Plaintiff alleges conclusorily that the County had a policy or custom of delaying the provision of medical care to other inmates until their release from custody (*see, e.g.,* Dkt. No. 1, ¶¶ 11, 87), Plaintiff fails to allege facts plausibly suggesting that any other inmate experienced a delay in receiving medical care (*see generally* Dkt. No. 1). Moreover, based on Plaintiff's own factual allegations, it appears that Defendant Johnston was not acting pursuant to any County policy or custom when he (allegedly) delayed Plaintiff's hernia surgery. (*Id.*) Rather, it appears Defendant Johnston was acting in contravention of the actions of numerous other County employees, including Dr. Roy A. Smith, Dr. Novick, and the several other doctors and nurses who appear to have provided Plaintiff rather prompt and continuous medical care during the time in question. *See, supra,* Part I.A. of this Decision and Order. The Court acknowledges that Plaintiff alleges that, on February 23, 2004, Dr. John Michaels, M.D., of the Justice Center, told Plaintiff that the treatment of his back pain would have to wait until after his release date. (Dkt. No. 1, ¶ 79.) However, he did so a mere two days before Plaintiff's scheduled release date, giving his explanation a certain quality of reasonableness given the common delays in scheduling and administering medical treatment in correctional facilities. (*Id.*) Moreover, it appears that, at the time, Dr. Michaels did not delay such treatment of Plaintiff's complaints of vomiting and constipation. (*Id.*) Finally, Plaintiff's Complaint contains no factual allegation plausibly suggesting that Dr. Michaels was acting at the behest of, or in concert with, Defendant Johnston, who is alleged to have been employed by an entirely different County department or agency. (*See generally* Dkt. No. 1.) Finally, the Court notes that, according to Defendant Johnston's (alleged) stated reason for delaying Plaintiff's hernia surgery, his motivation was not to save money (as a matter of policy) but to avoid urgent care in prison for what he characterized as Plaintiff's "non-urgent" condition. (*See* Dkt. No. 1, ¶¶ 28, 37, 40.)

For these reasons, the Court grants Defendants' motion to dismiss Plaintiff's Eighth Amendment claim against the County.

### D. Whether the Claims Against Defendants Cowin, Walsh and Johnston in Their Official Capacity Should Be Dismissed

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's claim against Defendants Cowin, Walsh and Johnston in their official capacity, because that claim is the same as Plaintiff's claim for municipal liability against the County (which has already been dismissed). Based on the factual allegations of Plaintiff's Complaint, and the fact that Plaintiff has failed to respond to this argument (thus lightening Defendants' burden with respect to the argument), the Court accepts Defendants' argument.

**\*9** To the extent Plaintiff sues Defendants Cowin, Walsh and Johnston in their official capacity, Plaintiff's claims are equivalent to a claim against the County and therefore subject to dismissal for the reasons just discussed above in Part III.C. of this Decision and Order. *See Powers,* 2004 WL 2123490, at \*2 ("To the extent that plaintiff sues the remaining defendants in their official capacity, plaintiff's claims are equivalent to a claim against the County of Erie and therefore subject to dismissal for the reasons just discussed [i.e., the plaintiff's failure to allege facts plausibly suggesting the existence of a municipal policy or custom that caused the violation of his constitutional rights.") (citations omitted); *Bangura v. County of Nassau,* 07-CV-2966, 2009 WL 57135, at \*3 (E .D.N.Y. Jan. 7, 2009) ("[T]he claims against Reilly in his official capacity are duplicative of his claims against the County" and therefore must be dismissed.").

Moreover, the Court notes that "municipalities, and municipal employees sued in their official capacities, are not liable for punitive damages, and accordingly, any claims for punitive damages against the County or any County employee sued in his official capacity, are dismissed." *Dzwonczyk v. Syracuse City Police Dept.,* 08-CV-0557, 2008 WL 5459147, at \* 16 (N.D.N.Y. Dec. 22, 2008) (McCurn, J.) (collecting cases). Because the Court interprets this rule as being premised on the doctrine of sovereign immunity under the Eleventh Amendment (and the absence of a waiver of that immunity in 42 U.S.C. § 1983), the Court concludes that the rule may be applied *sua sponte,* pursuant to Fed.R.Civ.P. 12(h)(3). *See*

*City of New Port v. Fact Concerts, Inc.,* 453 U.S. 247, 259-266 (1981) (indicating that rule in question is based on doctrine of sovereign immunity); *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) (explaining that, where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the claim in question, and it "must be stricken from the docket").

For these reasons, the Court grants Defendants' motion to dismiss Plaintiff's claim against Defendants Cowin, Walsh and Johnston in their official capacity. In addition, the Court *sua sponte* dismisses Plaintiff's claim for punitive damages.

### E. Whether Defendants Are Entitled to a Qualified Immunity Defense

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's claims against them based on the doctrine of qualified immunity. To the extent that any Defendants have already been dismissed from this action, the Court need not, and does not, evaluate this argument as it applies to them. To the extent that any Defendants have not already been dismissed from this action, the Court rejects Defendants' argument based on the factual allegations of Plaintiff's Complaint, and for the reasons stated by Plaintiff in his memorandum of law in opposition to Defendants' motion to dismiss.

**\*10** The Court would add only that discovery does not appear to have yet begun in this action. (Dkt. No. 15.) *See Brown v. DeFrank,* 06-CV-2235, 2006 WL 3313821, at \*29 (S.D.N.Y. Nov. 15, 2006) ("The right to be free from deliberate indifference to serious medical needs is well established and was at the time of defendants' conduct. The issue thus is whether defendants' actions [or failure to act] with respect to Brown's hip condition were subjectively unreasonable so as to constitute deliberate indifference. The Court cannot say on a motion to dismiss that any defendant's actions were so clear as to entitle them to dismissal on qualified immunity grounds at this stage of the case.").

For these reasons, the Court denies Defendants' motion to dismiss to the extent that it is premised on this ground.

Case 9:17-cv-00126-GTS-TWD   Document 15   Filed 12/22/17   Page 53 of 54
Scaccia v. County of Onondaga, New York, Not Reported in F.Supp.2d (2009)
2009 WL 4985683

### F. Whether Plaintiff Has Alleged Facts Plausibly Suggesting that Defendants Cowin, Walsh and Johnston-All Supervisors-Were Personally Involved in the Eighth Amendment Violation Alleged

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's claims against Defendants Cowin, Walsh and Johnston because Plaintiff has not alleged facts plausibly suggesting that any of those Defendants-each of whom was a supervisor-was personally involved in the Eighth Amendment violation alleged. The Court rejects this argument as it applies to Defendant Johnston, for the reasons stated above in Part III.B. and III.C. of this Decision and Order; however, the Court accepts this argument as it applies to Defendants Cowin and Walsh.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Excell v. Woods,* 07-CV-0305, 2009 WL 3124424, at *20 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.) [citations and internal quotation marks omitted]. "In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant." *Excell,* 2009 WL 3124424, at *20 [citation omitted]. "If the defendant is a supervisory official, such as a [deputy superintendent of a prison], a mere 'linkage' to the unlawful conduct through 'the prison chain of command' (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct." *Id.* [citations omitted]. "In other words, supervisory officials may not be held liable merely because they held a position of authority." *Id.* [citation omitted]. "Rather, supervisory personnel may be considered 'personally involved' only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring." *Id.* [citations omitted].

**\*11** Here, setting aside Plaintiff's conclusory allegations of liability on the part of Defendants Cowin and Walsh, Plaintiff's sole factual allegations giving rise to that liability turn merely on the following: (1) those two

Defendants' alleged roles as policymakers (a theory of liability that fails given the absence of factual allegations that there existed any municipal policy or custom under the circumstances); and/or (2) those two Defendants' positions as high-ranking supervisors of the Correctional Facility and Justice Center respectively, the staffs of which they were responsible to train and supervise (*see* Dkt. No. 1, ¶¶ 6, 7, 12, 14, 92, 93). There are simply no other factual allegations against those two Defendants. (*See generally* Dkt. No. 1.) Simply stated, Plaintiff's claims against Defendants Cowin and Walsh hinge entirely on their roles as supervisors of individuals who (allegedly) violated Plaintiff's constitutional rights. (*Id.*) Notably, Plaintiff alleges no facts plausibly suggesting how Defendants Cowin and Walsh failed to train and/or supervise their subordinates. (*Id.*)

For these reasons, the Court denies Defendants' motion to dismiss to the extent that it is premised on the (asserted) lack of personal involvement of Defendant Johnston, but grants Defendants' motion to dismiss to the extent that it is premised on the lack of personal involvement of Defendants Cowin and Walsh.

### G. Dismissal Without Prior Leave to Amend

The Court is cognizant of Plaintiff's right to amend his Complaint once as a matter of course before he has been served with a responsive pleading. See Fed.R.Civ.P. 15(a) (1). However, the Court notes that, during the two-and-a-half-year period during the pendency of Defendants' motion to dismiss (which of course is not a responsive pleading), Plaintiff has not exercised that right. Moreover, the Court has some skepticism regarding the ability of Plaintiff to cure the pleading defects in his claims against the County, Defendant Cowin and Defendant Walsh, given the fact that those claims (which were drafted by an attorney) appear in a Complaint that is organized, thorough and otherwise relatively detailed.

For these reasons, the Court dismisses Plaintiff's claims against the County, Defendant Cowin and Defendant Walsh without first *sua sponte* giving Plaintiff an opportunity to amend those claims. Rather, the Court simply dismisses those claims without prejudice, permitting Plaintiff to either amend them before an Answer is filed, or move to amend them after an Answer is filed, should he so choose. The Court notes that it dismisses Plaintiff claims against Defendants Cowin, Walsh, and Johnston in their official capacity, and his

Case 9:17-cv-00126-GTS-TWD    Document 15    Filed 12/22/17    Page 54 of 54

claim for punitive damages, with prejudice, due to the lack of a possibility that he can cure the substantive defects in them.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's claim for punitive damages is *sua sponte* **DISMISSED** with prejudice; and it is further

 **\*12 ORDERED** that Defendants' motion to dismiss (Dkt. No. 9) is ***GRANTED in part*** and ***DENIED*** in part as follows:

(1) Plaintiff's Eighth Amendment claim against the County is ***DISMISSED* without prejudice;**

(2) Plaintiff's Eighth Amendment claims against Defendants Cowin, Walsh, and Johnston in their official capacity are ***DISMISSED* with prejudice;**

(3) Plaintiff's Eighth Amendment claims against Defendants Cowin and Walsh are ***DISMISSED* without prejudice;** and

(4) Plaintiff's Eighth Amendment claim against Defendant Johnston in his individual capacity currently ***REMAINS PENDING*** in this action; and it is further

**ORDERED** that Defendant Johnston's answer to the complaint must be filed on or before *1l4l10.*

## All Citations

Not Reported in F.Supp.2d, 2009 WL 4985683

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.